(Slip Opinion) OCTOBER TERM, 2005 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SANCHEZ-LLAMAS *v.* OREGON

### CERTIORARI TO THE SUPREME COURT OF OREGON

No. 04–10566.   Argued March 29, 2006—Decided June 28, 2006*

Article 36(1)(b) of the Vienna Convention on Consular Relations provides that if a person detained by a foreign country "so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State" of such detention, and "inform the [detainee] of his rights under this sub-paragraph." Article 36(2) specifies: "The rights referred to in paragraph 1 . . . shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso . . . that the said laws . . . must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." Along with the Convention, the United States ratified the Optional Protocol Concerning the Compulsory Settlement of Disputes, which provides: "Disputes arising out of the . . . Convention shall lie within the compulsory jurisdiction of the International Court of Justice [(ICJ)]." The United States withdrew from the Protocol on March 7, 2005.

 Petitioner in No. 04–10566, Moises Sanchez-Llamas, is a Mexican national. When he was arrested after an exchange of gunfire with police, officers did not inform him that he could ask to have the Mexican Consulate notified of his detention. During interrogation, he made incriminating statements regarding the shootout. Before his trial for attempted murder and other offenses, Sanchez-Llamas moved to suppress those statements on the ground, *inter alia,* that the authorities had failed to comply with Article 36. The state court denied that motion and Sanchez-Llamas was convicted and sentenced to prison, and the Oregon Court of Appeals affirmed. The State Su-

––––––––––

 *Together with No. 05–51, *Bustillo* v. *Johnson, Director, Virginia Department of Corrections,* on certiorari to the Supreme Court of Virginia.

preme Court also affirmed, concluding that Article 36 does not create rights to consular access or notification that a detained individual can enforce in a judicial proceeding.

Petitioner in No. 05–51, Mario Bustillo, a Honduran national, was arrested and charged with murder, but police never informed him that he could request that the Honduran Consulate be notified of his detention. He was convicted and sentenced to prison, and his conviction and sentence were affirmed on appeal. He then filed a habeas petition in state court arguing, for the first time, that authorities had violated his right to consular notification under Article 36. The court dismissed that claim as procedurally barred because he had failed to raise it at trial or on appeal. The Virginia Supreme Court found no reversible error.

*Held:* Even assuming without deciding that the Convention creates judicially enforceable rights, suppression is not an appropriate remedy for a violation, and a State may apply its regular procedural default rules to Convention claims. Pp. 7–25.

(a) Because petitioners are not in any event entitled to relief, the Court need not resolve whether the Convention grants individuals enforceable rights, but assumes, without deciding, that Article 36 does so. Pp. 7–8.

(b) Neither the Convention itself nor this Court's precedents applying the exclusionary rule support suppression of a defendant's statements to police as a remedy for an Article 36 violation.

The Convention does not mandate suppression or any other specific remedy, but expressly leaves Article 36's implementation to domestic law: Article 36 rights must "be exercised in conformity with the laws . . . of the receiving State." Art. 36(2). Sanchez-Llamas' argument that suppression is appropriate under United States law and should be required under the Court's authority to develop remedies for the enforcement of federal law in state-court criminal proceedings is rejected. "It is beyond dispute that [this Court does] not hold a supervisory power over the [state] courts." *Dickerson* v. *United States,* 530 U. S. 428, 438. The exclusionary rule cases on which Sanchez-Llamas principally relies are inapplicable because they rest on the Court's supervisory authority over federal courts.

The Court's authority to create a judicial remedy applicable in state court must therefore lie, if anywhere, in the treaty itself. Where a treaty provides for a particular judicial remedy, courts must apply it as a requirement of federal law. Cf., *e.g., United States* v. *Giordano,* 416 U. S. 505, 524–525. But where a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one on the States through lawmaking of their own. Even if the "full effect" language of Article 36(2) implicitly

requires a judicial remedy, as Sanchez-Llamas claims, that Article equally requires that Article 36(1) rights be exercised in conformity with domestic law. Under domestic law, the exclusionary rule is not a remedy this Court applies lightly. It has been used primarily to deter certain Fourth and Fifth Amendment violations, including, *e.g.,* unconstitutional searches and seizures, *Mapp* v. *Ohio,* 367 U. S. 643, 655–657, and confessions exacted in violation of the right against compelled self-incrimination or due process, *Dickerson, supra,* at 435. In contrast, Article 36 has nothing to do with searches or interrogations and, indeed, does not guarantee defendants *any* assistance at all. It secures for foreign nationals only the right to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have police cease their investigation pending any such notice or intervention. Moreover, the failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions, see *Watkins* v. *Sowders,* 449 U. S. 341, 347, or to give the police any practical advantage in obtaining incriminating evidence, see *Elkins* v. *United States,* 364 U. S. 206, 217. Suppression would also be a vastly disproportionate remedy for an Article 36 violation. The interests Sanchez-Llamas claims Article 36 advances are effectively protected by other constitutional and statutory requirements, including the right to an attorney and to protection against compelled self-incrimination. Finally, suppression is not the only means of vindicating Article 36 rights. For example, diplomatic avenues—the primary means of enforcing the Vienna Convention—remain open. Pp. 8–15.

  (c) States may subject Article 36 claims to the same procedural default rules that apply generally to other federal-law claims.

  This question is controlled by the Court's holding in *Breard* v. *Greene,* 523 U. S. 371, 375, that the petitioner's failure to raise an Article 36 claim in state court prevented him from having the claim heard in a subsequent federal habeas proceeding. Bustillo's two reasons why *Breard* does not control are rejected.

  First, he argues that *Breard*'s procedural default holding was unnecessary to the result because the petitioner there could not demonstrate prejudice from the default and because, in any event, the later enacted Antiterrorism and Effective Death Penalty Act of 1996 superseded any right the petitioner had under the Vienna Convention to have his claim heard on collateral review. Resolution of the procedural default question, however, was the principal reason for denying the *Breard* petitioner's claim, and the discussion of the issue occupied the bulk of the Court's reasoning. See 523 U. S., at 375–377. It is no answer to argue that the procedural default holding was unnecessary simply because the petitioner had several other ways to lose.

Second, Bustillo asserts that since *Breard*, the ICJ's *LaGrand* and *Avena* decisions have interpreted the Convention to preclude the application of procedural default rules to Article 36 claims. Although the ICJ's interpretation deserves "respectful consideration," *Breard, supra,* at 375, it does not compel the Court to reconsider *Breard*'s understanding of the Convention. "The judicial Power of the United States" is "vested in one supreme Court . . . and . . . inferior courts." U. S. Const., Art. III, §1. That "power . . . extend[s] to . . . treaties," Art. III, §2, and includes the duty "to say what the law is," *Marbury* v. *Madison,* 1 Cranch 137, 177. If treaties are to be given effect as federal law, determining their meaning as a matter of federal law "is emphatically the province and duty of the judicial department," headed by the "one supreme Court." *Ibid.* Nothing in the ICJ's structure or purpose suggests that its interpretations were intended to be binding on U. S. courts. Even according "respectful consideration," the ICJ's interpretation cannot overcome the plain import of Article 36(2), which states that the rights it implements "shall be exercised in conformity with the laws . . . of the receiving State." In the United States, this means that the rule of procedural default—which applies even to claimed violations of our own Constitution, see *Engle* v. *Isaac,* 456 U. S. 107, 129—applies also to Vienna Convention claims. Bustillo points to nothing in the drafting history of Article 36 or in the contemporary practice of other Convention signatories that undermines this conclusion. *LaGrand*'s conclusion that applying the procedural default rule denies "full effect" to the purposes of Article 36, by preventing courts from attaching legal significance to an Article 36 violation, is inconsistent with the basic framework of an adversary system. Such a system relies chiefly on the *parties* to raise significant issues and present them to the courts in the appropriate manner at the appropriate time for adjudication. See *Castro* v. *United States,* 540 U. S. 375, 386. Procedural default rules generally take on greater importance in an adversary system than in the sort of magistrate-directed, inquisitorial legal system characteristic of many of the other Convention signatories. Under the ICJ's reading of "full effect," Article 36 claims could trump not only procedural default rules, but any number of other rules requiring parties to present their legal claims at the appropriate time for adjudication, such as statutes of limitations and prohibitions against filing successive habeas petitions. This sweeps too broadly, for it reads the "full effect" proviso in a way that leaves little room for the clear instruction in Article 36(2) that Article 36 rights "be exercised in conformity with the laws . . . of the receiving State." A comparison with a suspect's rights under *Miranda* v. *Arizona,* 384 U. S. 436, disposes of Bustillo's "full effect" claim. Although the failure to inform defendants of their

Syllabus

right to consular notification may prevent them from becoming aware of their Article 36 rights and asserting them at trial, precisely the same thing is true of *Miranda* rights. Nevertheless, if a defendant fails to raise his *Miranda* claim at trial, procedural default rules may bar him from raising the claim in a subsequent postconviction proceeding. *Wainwright* v. *Sykes,* 433 U. S. 72, 87. Bustillo's attempt to analogize an Article 36 claim to a claim under *Brady* v. *Maryland,* 373 U. S. 83, that the prosecution failed to disclose exculpatory evidence is inapt. Finally, his argument that Article 36 claims are most appropriately raised post-trial or on collateral review under *Massaro* v. *United States*, 538 U. S. 500, is rejected. See *Dickerson*, *supra*, at 438. Pp. 15–25.

(d) The Court's holding in no way disparages the Convention's importance. It is no slight to the Convention to deny petitioners' claims under the same principles this Court would apply to claims under an Act of Congress or the Constitution itself. P. 25.

No. 04–10566, 338 Ore. 267, 108 P. 3d 573, and No. 05–51, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment. BREYER, J., filed a dissenting opinion, in which STEVENS and SOUTER, JJ., joined, and in which GINSBURG, J., joined as to Part II.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 04–10566 and 05–51

MOISES SANCHEZ-LLAMAS, PETITIONER
04–10566				*v.*
OREGON

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
OREGON

MARIO A. BUSTILLO, PETITIONER
05–51					*v.*
GENE M. JOHNSON, DIRECTOR, VIRGINIA
DEPARTMENT OF CORRECTIONS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
VIRGINIA

[June 28, 2006]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

Article 36 of the Vienna Convention on Consular Rela-
tions (Vienna Convention or Convention), Apr. 24, 1963,
[1970] 21 U. S. T. 77, 100–101, T. I. A. S. No. 6820, ad-
dresses communication between an individual and his
consular officers when the individual is detained by au-
thorities in a foreign country. These consolidated cases
concern the availability of judicial relief for violations of
Article 36. We are confronted with three questions. *First*,
does Article 36 create rights that defendants may invoke
against the detaining authorities in a criminal trial or in a
postconviction proceeding? *Second*, does a violation of
Article 36 require suppression of a defendant's statements

to police? *Third*, may a State, in a postconviction proceeding, treat a defendant's Article 36 claim as defaulted because he failed to raise the claim at trial? We conclude, even assuming the Convention creates judicially enforceable rights, that suppression is not an appropriate remedy for a violation of Article 36, and that a State may apply its regular rules of procedural default to Article 36 claims. We therefore affirm the decisions below.

## I

## A

The Vienna Convention was drafted in 1963 with the purpose, evident in its preamble, of "contribut[ing] to the development of friendly relations among nations, irrespective of their differing constitutional and social systems." 21 U. S. T., at 79. The Convention consists of 79 articles regulating various aspects of consular activities. At present, 170 countries are party to the Convention. The United States, upon the advice and consent of the Senate, ratified the Convention in 1969. *Id.,* at 77.

Article 36 of the Convention concerns consular officers' access to their nationals detained by authorities in a foreign country. The article provides that "if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." Art. 36(1)(b), *id.,* at 101.[1] In other words, when a national of

_____

[1] In its entirety, Article 36 of the Vienna Convention states:

"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

"(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

"(b) if he so requests, the competent authorities of the receiving State

one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests. Article 36(1)(b) further states that "[t]he said authorities shall inform the person concerned [*i.e.*, the detainee] without delay of his rights under this sub-paragraph." *Ibid.* The Convention also provides guidance regarding how these requirements, and the other requirements of Article 36, are to be implemented:

> "The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." Art. 36(2), *ibid.*

----

shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

  "(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

  "2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." 21 U. S. T., at 100–101.

Along with the Vienna Convention, the United States ratified the Optional Protocol Concerning the Compulsory Settlement of Disputes (Optional Protocol or Protocol), Apr. 24, 1963, [1970] 21 U. S. T. 325, T. I. A. S. No. 6820. The Optional Protocol provides that "[d]isputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice [(ICJ)]," and allows parties to the Protocol to bring such disputes before the ICJ. *Id.,* at 326. The United States gave notice of its withdrawal from the Optional Protocol on March 7, 2005. Letter from Condoleezza Rice, Secretary of State, to Kofi A. Annan, Secretary-General of the United Nations.

B

Petitioner Moises Sanchez-Llamas is a Mexican national. In December 1999, he was involved in an exchange of gunfire with police in which one officer suffered a gunshot wound in the leg. Police arrested Sanchez-Llamas and gave him warnings under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), in both English and Spanish. At no time, however, did they inform him that he could ask to have the Mexican Consulate notified of his detention.

Shortly after the arrest and *Miranda* warnings, police interrogated Sanchez-Llamas with the assistance of an interpreter. In the course of the interrogation, Sanchez-Llamas made several incriminating statements regarding the shootout with police. He was charged with attempted aggravated murder, attempted murder, and several other offenses. Before trial, Sanchez-Llamas moved to suppress the statements he made to police. He argued that suppression was warranted because the statements were made involuntarily and because the authorities had failed to comply with Article 36 of the Vienna Convention. The trial court denied the motion. The case proceeded to trial, and Sanchez-Llamas was convicted and sentenced to 20½

years in prison.

He appealed, again arguing that the Vienna Convention violation required suppression of his statements. The Oregon Court of Appeals affirmed. Judgt. order reported at 191 Ore. App. 399, 84 P. 3d 1133 (2004). The Oregon Supreme Court also affirmed, concluding that Article 36 "does not create rights to consular access or notification that are enforceable by detained individuals in a judicial proceeding." 338 Ore. 267, 276, 108 P. 3d 573, 578 (2005) (en banc). We granted certiorari. 546 U. S. ___ (2005).

## C

Petitioner Mario Bustillo, a Honduran national, was with several other men at a restaurant in Springfield, Virginia, on the night of December 10, 1997. That evening, outside the restaurant, James Merry was struck in the head with a baseball bat as he stood smoking a cigarette. He died several days later. Several witnesses at the scene identified Bustillo as the assailant. Police arrested Bustillo the morning after the attack and eventually charged him with murder. Authorities never informed him that he could request to have the Honduran Consulate notified of his detention.

At trial, the defense pursued a theory that another man, known as "Sirena," was responsible for the attack. Two defense witnesses testified that Bustillo was not the killer. One of the witnesses specifically identified the attacker as Sirena. In addition, a third defense witness stated that she had seen Sirena on a flight to Honduras the day after the victim died. In its closing argument before the jury, the prosecution dismissed the defense theory about Sirena. See App. in No. 05–51, p. 21 ("This whole Sirena thing, I don't want to dwell on it too much. It's very convenient that Mr. Sirena apparently isn't available"). A jury convicted Bustillo of first-degree murder, and he was sentenced to 30 years in prison. His conviction and sen-

tence were affirmed on appeal.

After his conviction became final, Bustillo filed a peti-
tion for a writ of habeas corpus in state court. There, for
the first time, he argued that authorities had violated his
right to consular notification under Article 36 of the Vi-
enna Convention. He claimed that if he had been advised
of his right to confer with the Honduran Consulate, he
"would have done so without delay." App. in No. 05–51,
p. 60. Moreover, the Honduran Consulate executed an
affidavit stating that "it would have endeavoured to help
Mr. Bustillo in his defense" had it learned of his detention
prior to trial. *Id.,* at 74. Bustillo insisted that the consu-
late could have helped him locate Sirena prior to trial. His
habeas petition also argued, as part of a claim of ineffective
assistance of counsel, that his attorney should have advised
him of his right to notify the Honduran Consulate of his
arrest and detention.[2]

The state habeas court dismissed Bustillo's Vienna
Convention claim as "procedurally barred" because he had
failed to raise the issue at trial or on appeal. App. to Pet.
for Cert. in No. 05–51, p. 43a. The court also denied Bust-
illo's claim of ineffective assistance of counsel, ruling that

---

[2] Bustillo's habeas petition also presented newly acquired evidence
that tended to cast doubt on his conviction. Most notably, he produced
a secretly recorded videotape in which Sirena admitted killing Merry
and stated that Bustillo had been wrongly convicted. App. in No. 05–
51, pp. 38, 54. In addition, Bustillo argued that the prosecution vio-
lated *Brady* v. *Maryland,* 373 U. S. 83 (1963), by failing to disclose that
on the night of the crime, police had questioned a man named "Julio C.
Osorto," who is now known to be the same man as "Sirena." The police
report concerning the encounter stated that Sirena appeared to have
ketchup on his pants. Bustillo contends that these stains might in fact
have been the victim's blood. The Commonwealth disputes this. The
state habeas court found "no evidence of any transfer of the victim's
blood to the assailant," and concluded that the undisclosed encounter
between police and Sirena was not material under *Brady*. App. in No.
05–51, p. 167.

his belated claim that counsel should have informed him of his Vienna Convention rights was barred by the applicable statute of limitations and also meritless under *Strickland* v. *Washington,* 466 U. S. 668 (1984). App. in No. 05–51, p. 132. In an order refusing Bustillo's petition for appeal, the Supreme Court of Virginia found "no reversible error" in the habeas court's dismissal of the Vienna Convention claim. App. to Pet. for Cert. in No. 05–51, p. 1a. We granted certiorari to consider the Vienna Convention issue. 546 U. S. \_\_\_ (2005).

## II

We granted certiorari as to three questions presented in these cases: (1) whether Article 36 of the Vienna Convention grants rights that may be invoked by individuals in a judicial proceeding; (2) whether suppression of evidence is a proper remedy for a violation of Article 36; and (3) whether an Article 36 claim may be deemed forfeited under state procedural rules because a defendant failed to raise the claim at trial.

As a predicate to their claims for relief, Sanchez-Llamas and Bustillo each argue that Article 36 grants them an individually enforceable right to request that their consular officers be notified of their detention, and an accompanying right to be informed by authorities of the availability of consular notification. Respondents and the United States, as *amicus curiae,* strongly dispute this contention. They argue that "there is a presumption that a treaty will be enforced through political and diplomatic channels, rather than through the courts." Brief for United States 11; *ibid.* (quoting *Head Money Cases,* 112 U. S. 580, 598 (1884) (a treaty "'is primarily a compact between independent nations,'" and "'depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it'")). Because we conclude that Sanchez-Llamas and Bustillo are not in any event entitled

to relief on their claims, we find it unnecessary to resolve the question whether the Vienna Convention grants individuals enforceable rights. Therefore, for purposes of addressing petitioners' claims, we assume, without deciding, that Article 36 does grant Bustillo and Sanchez-Llamas such rights.

A

Sanchez-Llamas argues that the trial court was required to suppress his statements to police because authorities never told him of his rights under Article 36. He refrains, however, from arguing that the Vienna Convention itself mandates suppression. We think this a wise concession. The Convention does not prescribe specific remedies for violations of Article 36. Rather, it expressly leaves the implementation of Article 36 to domestic law: Rights under Article 36 are to "be exercised in conformity with the laws and regulations of the receiving State." Art. 36(2), 21 U. S. T., at 101. As far as the text of the Convention is concerned, the question of the availability of the exclusionary rule for Article 36 violations is a matter of domestic law.

It would be startling if the Convention were read to require suppression. The exclusionary rule as we know it is an entirely American legal creation. See *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 415 (1971) (Burger, C. J., dissenting) (the exclusionary rule "is unique to American jurisprudence"). More than 40 years after the drafting of the Convention, the automatic exclusionary rule applied in our courts is still "universally rejected" by other countries. Bradley, *Mapp* Goes Abroad, 52 Case W. Res. L. Rev. 375, 399–400 (2001); see also *Zicherman* v. *Korean Air Lines Co.,* 516 U. S. 217, 226 (1996) (postratification understanding "traditionally considered" as an aid to treaty interpretation). It is implausible that other signatories to the Convention thought it to require a remedy that

nearly all refuse to recognize as a matter of domestic law. There is no reason to suppose that Sanchez-Llamas would be afforded the relief he seeks here in any of the other 169 countries party to the Vienna Convention.[3]

For good reason then, Sanchez-Llamas argues only that suppression is required because it is the appropriate remedy for an Article 36 violation under United States law, and urges us to require suppression for Article 36 violations as a matter of our "authority to develop remedies for the enforcement of federal law in state-court criminal proceedings." Reply Brief for Petitioner in No.

––––––––––

[3] See Declaration of Ambassador Maura A. Harty, Annex 4 to Counter-Memorial of the United States in *Case Concerning Avena and other Mexican Nationals (Mex.* v. *U. S.)*, 2004 I. C. J. No. 128, p. A386, ¶41 (Oct. 25, 2003) (Harty Declaration) ("With the possible exception of Brazil, we are not aware of a single country that has a law, regulation or judicial decision requiring that a statement taken before consular notification and access automatically must be excluded from use at trial" (footnote omitted)). According to the Harty Declaration, the American Embassy in Brazil has been advised that Brazil considers consular notification to be a right under the Brazilian Constitution. Neither the declaration nor the parties point to a case in which a Brazilian court has suppressed evidence because of a violation of that right.

In a few cases, as several *amici* point out, the United Kingdom and Australia appear to have applied a discretionary rule of exclusion for violations of domestic statutes implementing the Vienna Convention. See Brief for United States as *Amicus Curiae* 26, and n. 9; Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 16–23. The dissent similarly relies on two cases from Australia, *post*, at 32 (opinion of BREYER, J.) (citing *Tan Seng Kiah* v. *Queen* (2001) 160 F. L. R. 26 (Ct. Crim. App. N. Terr.) and *Queen* v. *Tan* [2001] W. A. S. C. 275 (Sup. Ct. W. Australia in Crim.)), where consular notification rights are governed by a domestic statute that provides rights beyond those required by Article 36 itself. See Crimes Act, No. 12, 1914, §23p (Australia). The Canadian case on which the dissent relies, *post*, at 32, denied suppression, and concerned only the court's general discretionary authority to exclude a confession "whose admission would adversely affect the fairness of an accused's trial." *Queen* v. *Partak* [2001] 160 C. C. C. 3d 553, ¶61 (Ont. Super. Ct. of J.).

04–10566, p. 11.

For their part, the State of Oregon and the United States, as *amicus curiae,* contend that we lack any such authority over state-court proceedings. They argue that our cases suppressing evidence obtained in violation of federal statutes are grounded in our supervisory authority over the federal courts—an authority that does not extend to state-court proceedings. Brief for Respondent in No. 04–10566, pp. 42–43; Brief for United States 32–34; see *McNabb* v. *United States,* 318 U. S. 332, 341 (1943) (suppressing evidence for violation of federal statute requiring persons arrested without a warrant to be promptly presented to a judicial officer); *Mallory* v. *United States,* 354 U. S. 449 (1957) (suppressing evidence for violation of similar requirement of Fed. Rule Crim. Proc. 5(a)); *Miller* v. *United States,* 357 U. S. 301 (1958) (suppressing evidence obtained incident to an arrest that violated 18 U. S. C. §3109). Unless required to do so by the Convention itself, they argue, we cannot direct Oregon courts to exclude Sanchez-Llamas' statements from his criminal trial.

To the extent Sanchez-Llamas argues that we should invoke our supervisory authority, the law is clear: "It is beyond dispute that we do not hold a supervisory power over the courts of the several States." *Dickerson* v. *United States,* 530 U. S. 428, 438 (2000); see also *Smith* v. *Phillips,* 455 U. S. 209, 221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension"). The cases on which Sanchez-Llamas principally relies are inapplicable in light of the limited reach of our supervisory powers. *Mallory* and *McNabb* plainly rest on our supervisory authority. *Mallory, supra,* at 453; *McNabb, supra,* at 340. And while *Miller* is not clear about its authority for requiring suppression, we have understood it to have a similar basis. See *Ker* v. *California,* 374 U. S. 23, 31 (1963).

We also agree with the State of Oregon and the United States that our authority to create a judicial remedy applicable in state court must lie, if anywhere, in the treaty itself. Under the Constitution, the President has the power, "by and with the Advice and Consent of the Senate, to make Treaties." Art. II, §2, cl. 2. The United States ratified the Convention with the expectation that it would be interpreted according to its terms. See Restatement (Third) of Foreign Relations Law of the United States §325(1) (1986) ("An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose"). If we were to require suppression for Article 36 violations without some authority in the Convention, we would in effect be supplementing those terms by enlarging the obligations of the United States under the Convention. This is entirely inconsistent with the judicial function. Cf. *The Amiable Isabella,* 6 Wheat. 1, 71 (1821) (Story, J.) ("[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty").

Of course, it is well established that a self-executing treaty binds the States pursuant to the Supremacy Clause, and that the States therefore must recognize the force of the treaty in the course of adjudicating the rights of litigants. See, *e.g., Hauenstein* v. *Lynham,* 100 U. S. 483 (1880). And where a treaty provides for a particular judicial remedy, there is no issue of intruding on the constitutional prerogatives of the States or the other federal branches. Courts must apply the remedy as a requirement of federal law. Cf. 18 U. S. C. §2515; *United States* v. *Giordano,* 416 U. S. 505, 524–525 (1974). But where a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one on the States

through lawmaking of their own.

Sanchez-Llamas argues that the language of the Convention implicitly requires a judicial remedy because it states that the laws and regulations governing the exercise of Article 36 rights "must enable *full effect* to be given to the purposes for which the rights . . . are intended," Art. 36(2), 21 U. S. T., at 101 (emphasis added). In his view, although "full effect" may not automatically require an exclusionary rule, it does require an appropriate judicial remedy of *some* kind. There is reason to doubt this interpretation. In particular, there is little indication that other parties to the Convention have interpreted Article 36 to require a judicial remedy in the context of criminal prosecutions. See Department of State Answers to Questions Posed by the First Circuit in *United States* v. *Nai Fook Li,* No. 97–2034 etc., p. A–9 (Oct. 15, 1999) ("We are unaware of any country party to the [Vienna Convention] that provides remedies for violations of consular notification through its domestic criminal justice system").

Nevertheless, even if Sanchez-Llamas is correct that Article 36 implicitly requires a judicial remedy, the Convention equally states that Article 36 rights "shall be exercised in conformity with the laws and regulations of the receiving State." Art. 36(2), 21 U. S. T., at 101. Under our domestic law, the exclusionary rule is not a remedy we apply lightly. "[O]ur cases have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." *Pennsylvania Bd. of Probation and Parole* v. *Scott,* 524 U. S. 357, 364–365 (1998). Because the rule's social costs are considerable, suppression is warranted only where the rule's "'remedial objectives are thought most efficaciously served.'" *United States* v. *Leon,* 468 U. S. 897, 908 (1984) (quoting *United States* v. *Calandra,* 414 U. S. 338, 348 (1974)).

We have applied the exclusionary rule primarily to deter

constitutional violations. In particular, we have ruled that the Constitution requires the exclusion of evidence obtained by certain violations of the Fourth Amendment, see *Taylor* v. *Alabama,* 457 U. S. 687, 694 (1982) (arrests in violation of the Fourth Amendment); *Mapp* v. *Ohio,* 367 U. S. 643, 655–657 (1961) (unconstitutional searches and seizures), and confessions exacted by police in violation of the right against compelled self-incrimination or due process, see *Dickerson,* 530 U. S., at 435 (failure to give *Miranda* warnings); *Payne* v. *Arkansas,* 356 U. S. 560, 568 (1958) (involuntary confessions).

The few cases in which we have suppressed evidence for statutory violations do not help Sanchez-Llamas. In those cases, the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests. *McNabb,* for example, involved the suppression of incriminating statements obtained during a prolonged detention of the defendants, in violation of a statute requiring persons arrested without a warrant to be promptly presented to a judicial officer. We noted that the statutory right was intended to "avoid all the evil implications of secret interrogation of persons accused of crime," 318 U. S., at 344, and later stated that *McNabb* was "responsive to the same considerations of Fifth Amendment policy that . . . face[d] us . . . as to the states" in *Miranda,* 384 U. S., at 463. Similarly, in *Miller,* we required suppression of evidence that was the product of a search incident to an unlawful arrest. 357 U. S., at 305; see *California* v. *Hodari D.,* 499 U. S. 621, 624 (1991) ("We have long understood that the Fourth Amendment's protection against 'unreasonable . . . seizures' includes seizure of the person").

The violation of the right to consular notification, in contrast, is at best remotely connected to the gathering of evidence. Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not

guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police.

Moreover, the reasons we often require suppression for Fourth and Fifth Amendment violations are entirely absent from the consular notification context. We require exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable. *Watkins* v. *Sowders,* 449 U. S. 341, 347 (1981). We exclude the fruits of unreasonable searches on the theory that without a strong deterrent, the constraints of the Fourth Amendment might be too easily disregarded by law enforcement. *Elkins* v. *United States,* 364 U. S. 206, 217 (1960). The situation here is quite different. The failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions. And unlike the search-and-seizure context—where the need to obtain valuable evidence may tempt authorities to transgress Fourth Amendment limitations—police win little, if any, practical advantage from violating Article 36. Suppression would be a vastly disproportionate remedy for an Article 36 violation.

Sanchez-Llamas counters that the failure to inform defendants of their right to consular notification gives them "a misleadingly incomplete picture of [their] legal options," Brief for Petitioner in No. 04–10566, p. 42, and that suppression will give authorities an incentive to abide by Article 36.

Leaving aside the suggestion that it is the role of police generally to advise defendants of their legal options, we think other constitutional and statutory requirements

effectively protect the interests served, in Sanchez-Llamas' view, by Article 36. A foreign national detained on suspicion of crime, like anyone else in our country, enjoys under our system the protections of the Due Process Clause. Among other things, he is entitled to an attorney, and is protected against compelled self-incrimination. See *Wong Wing* v. *United States,* 163 U. S. 228, 238 (1896) ("[A]ll persons within the territory of the United States are entitled to the protection guaranteed by" the Fifth and Sixth Amendments). Article 36 adds little to these "legal options," and we think it unnecessary to apply the exclusionary rule where other constitutional and statutory protections—many of them already enforced by the exclusionary rule—safeguard the same interests Sanchez-Llamas claims are advanced by Article 36.

Finally, suppression is not the only means of vindicating Vienna Convention rights. A defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police. If he raises an Article 36 violation at trial, a court can make appropriate accommodations to ensure that the defendant secures, to the extent possible, the benefits of consular assistance. Of course, diplomatic avenues—the primary means of enforcing the Convention—also remain open.

In sum, neither the Vienna Convention itself nor our precedents applying the exclusionary rule support suppression of Sanchez-Llamas' statements to police.

## B

The Virginia courts denied petitioner Bustillo's Article 36 claim on the ground that he failed to raise it at trial or on direct appeal. The general rule in federal habeas cases is that a defendant who fails to raise a claim on direct appeal is barred from raising the claim on collateral review. See *Massaro* v. *United States,* 538 U. S. 500, 504 (2003); *Bousley* v. *United States,* 523 U. S. 614, 621 (1998).

There is an exception if a defendant can demonstrate both
"cause" for not raising the claim at trial, and "prejudice"
from not having done so. *Massaro, supra,* at 504. Like
many States, Virginia applies a similar rule in state post-
conviction proceedings, and did so here to bar Bustillo's
Vienna Convention claim. Normally, in our review of
state-court judgments, such rules constitute an adequate
and independent state-law ground preventing us from
reviewing the federal claim. *Coleman* v. *Thompson,* 501
U. S. 722, 729 (1991). Bustillo contends, however, that
state procedural default rules cannot apply to Article 36
claims. He argues that the Convention requires that
Article 36 rights be given "'full effect'" and that Virginia's
procedural default rules "prevented any effect (much less
'full effect') from being given to" those rights. Brief for
Petitioner in No. 05–51, p. 35.

This is not the first time we have been asked to set aside
procedural default rules for a Vienna Convention claim.
Respondent Johnson and the United States persuasively
argue that this question is controlled by our decision in
*Breard* v. *Greene,* 523 U. S. 371 (1998) *(per curiam).* In
*Breard*, the petitioner failed to raise an Article 36 claim in
state court—at trial or on collateral review—and then
sought to have the claim heard in a subsequent federal
habeas proceeding. *Id.,* at 375. He argued that "the Con-
vention is the 'supreme law of the land' and thus trumps
the procedural default doctrine." *Ibid.* We rejected this
argument as "plainly incorrect," for two reasons. *Ibid.*
First, we observed, "it has been recognized in interna-
tional law that, absent a clear and express statement to
the contrary, the procedural rules of the forum State
govern the implementation of the treaty in that State."
*Ibid.* Furthermore, we reasoned that while treaty protec-
tions such as Article 36 may constitute supreme federal
law, this is "no less true of provisions of the Constitution
itself, to which rules of procedural default apply." *Id.,* at

376. In light of *Breard*'s holding, Bustillo faces an uphill task in arguing that the Convention requires States to set aside their procedural default rules for Article 36 claims.

Bustillo offers two reasons why *Breard* does not control his case. He first argues that *Breard*'s holding concerning procedural default was "unnecessary to the result," Brief for Petitioner in No. 05–51, p. 45, because the petitioner there could not demonstrate prejudice from the default and because, in any event, a subsequent federal statute— the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214—superseded any right the petitioner had under the Vienna Convention to have his claim heard on collateral review. We find Bustillo's contention unpersuasive. Our resolution of the procedural default question in *Breard* was the principal reason for the denial of the petitioner's claim, and the discussion of the issue occupied the bulk of our reasoning. See 523 U. S., at 375–377. It is no answer to argue, as Bustillo does, that the holding in *Breard* was "unnecessary" simply because the petitioner in that case had several ways to lose. See *Richmond Screw Anchor Co.* v. *United States,* 275 U. S. 331, 340 (1928).

Bustillo's second reason is less easily dismissed. He argues that since *Breard*, the ICJ has interpreted the Vienna Convention to preclude the application of procedural default rules to Article 36 claims. The *LaGrand Case (F. R. G.* v. *U. S.),* 2001 I. C. J. 466 (Judgment of June 27) *(LaGrand)*, and the *Case Concerning Avena and other Mexican Nationals (Mex.* v. *U. S.),* 2004 I. C. J. No. 128 (Judgment of Mar. 31) *(Avena),* were brought before the ICJ by the governments of Germany and Mexico, respectively, on behalf of several of their nationals facing death sentences in the United States. The foreign governments claimed that their nationals had not been informed of their right to consular notification. They further argued that application of the procedural default rule to their nationals' Vienna Convention claims failed to give

"full effect" to the purposes of the Convention, as required by Article 36. The ICJ agreed, explaining that the defendants had procedurally defaulted their claims "because of the failure of the American authorities to comply with their obligation under Article 36." *LaGrand, supra,* at 497, ¶91; see also *Avena, supra*, ¶113. Application of the procedural default rule in such circumstances, the ICJ reasoned, "prevented [courts] from attaching any legal significance" to the fact that the violation of Article 36 kept the foreign governments from assisting in their nationals' defense. *LaGrand, supra,* at 497, ¶91; see also *Avena, supra*, ¶113.

Bustillo argues that *LaGrand* and *Avena* warrant revisiting the procedural default holding of *Breard*. In a similar vein, several *amici* contend that "the United States is *obligated* to comply with the Convention, *as interpreted by the ICJ.*" Brief for ICJ Experts 11 (emphases added). We disagree. Although the ICJ's interpretation deserves "respectful consideration," *Breard, supra,* at 375, we conclude that it does not compel us to reconsider our understanding of the Convention in *Breard*.[4]

Under our Constitution, "[t]he judicial Power of the United States" is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Art. III, §1. That "judicial Power . . . extend[s] to . . . Treaties." *Id.*, §2. And, as Chief Justice Marshall famously explained, that judicial power

---

[4] The dissent, in light of *LaGrand* and *Avena*, "would read *Breard* . . . as not saying that the Convention *never* trumps any procedural default rule." *Post,* at 26 (opinion of BREYER, J.). This requires more than "reading an exception into *Breard*'s language," *post,* at 27, amounting instead to overruling *Breard*'s plain holding that the Convention does not trump the procedural default doctrine. While the appeal of such a course to a *Breard* dissenter may be clear, see 523 U. S., at 380 (BREYER, J., dissenting), "respectful consideration" of precedent should begin at home.

includes the duty "to say what the law is." *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803). If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law "is emphatically the province and duty of the judicial department," headed by the "one supreme Court" established by the Constitution. *Ibid.;* see also *Williams* v. *Taylor,* 529 U. S. 362, 378–379 (2000) (opinion of STEVENS, J.) ("At the core of [the judicial] power is the federal courts' independent responsibility—independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States—to interpret federal law"). It is against this background that the United States ratified, and the Senate gave its advice and consent to, the various agreements that govern referral of Vienna Convention disputes to the ICJ.

Nothing in the structure or purpose of the ICJ suggests that its interpretations were intended to be conclusive on our courts.[5] The ICJ's decisions have "*no binding force*

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[5] The dissent's extensive list of lower court opinions that have "looked to the ICJ for guidance," *post*, at 21–22, is less impressive than first appears. Many of the cited opinions merely refer to, or briefly describe, ICJ decisions without in any way relying on them as authority. See, *e.g., Committee of United States Citizens Living in Nicaragua* v. *Reagan*, 859 F. 2d 929, 932, 935 (CADC 1988); *Conservation Law Foundation of New England* v. *Secretary of Interior*, 790 F. 2d 965, 967 (CA1 1986); *Narenji* v. *Civiletti*, 617 F. 2d 745, 748 (CADC 1979); *Diggs* v. *Richardson*, 555 F. 2d 848, 849 (CADC 1976); *Rogers* v. *Societe Internationale Pour Participations Industrielles et Commerciales, S. A.*, 278 F. 2d 268, 273, n. 3 (CADC 1960) (Fahy, J., dissenting). Others cite ICJ opinions alongside law review articles for general propositions about international law. See, *e.g., McKesson Corp.* v. *Islamic Republic of Iran*, 52 F. 3d 346, 352 (CADC 1995); *Princz* v. *Federal Republic of Germany*, 26 F. 3d 1166, 1180, 1184 (CADC 1994) (Wald, J., dissenting); *Sadat* v. *Mertes*, 615 F. 2d 1176, 1187, n. 14 (CA7 1980); *United States* v. *Postal*, 589 F. 2d 862, 869 (CA5 1979). Moreover, all but two of the cited decisions from this Court concern technical issues of boundary demarcation. See *post,* at 21.

except between the parties and in respect of that particular case," Statute of the International Court of Justice, Art. 59, 59 Stat. 1062, T. S. No. 993 (1945) (emphasis added). Any interpretation of law the ICJ renders in the course of resolving particular disputes is thus not binding precedent *even as to the ICJ itself;* there is accordingly little reason to think that such interpretations were intended to be controlling on our courts. The ICJ's principal purpose is to arbitrate particular disputes between national governments. *Id.,* at 1055 (ICJ is "the principal judicial organ of the United Nations"); see also Art. 34, *id.,* at 1059 ("Only states [*i.e.,* countries] may be parties in cases before the Court"). While each member of the United Nations has agreed to comply with decisions of the ICJ "in any case to which it is a party," United Nations Charter, Art. 94(1), 59 Stat. 1051, T. S. No. 933 (1945), the Charter's procedure for noncompliance—referral to the Security Council by the aggrieved state—contemplates quintessentially *international* remedies, Art. 94(2), *ibid.*

In addition, "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." *Kolovrat* v. *Oregon,* 366 U. S. 187, 194 (1961). Although the United States has agreed to "discharge its international obligations" in having state courts give effect to the decision in *Avena*, it has not taken the view that the ICJ's interpretation of Article 36 is binding on our courts. President Bush, Memorandum for the Attorney General (Feb. 28, 2005), App. to Brief for United States as *Amicus Curiae* in *Medellín* v. *Dretke,* O. T. 2004, No. 04–5928, p. 9a. Moreover, shortly after *Avena*, the United States withdrew from the Optional Protocol concerning Vienna Convention disputes. Whatever the effect of *Avena* and *LaGrand* before this withdrawal, it is doubtful that our courts should give decisive weight to the interpretation of a

tribunal whose jurisdiction in this area is no longer recognized by the United States.

*LaGrand* and *Avena* are therefore entitled only to the "respectful consideration" due an interpretation of an international agreement by an international court. *Breard*, 523 U. S., at 375. Even according such consideration, the ICJ's interpretation cannot overcome the plain import of Article 36. As we explained in *Breard*, the procedural rules of domestic law generally govern the implementation of an international treaty. *Ibid.* In addition, Article 36 makes clear that the rights it provides "shall be exercised in conformity with the laws and regulations of the receiving State" provided that "full effect . . . be given to the purposes for which the rights accorded under this Article are intended." Art. 36(2), 21 U. S. T., at 101. In the United States, this means that the rule of procedural default—which applies even to claimed violations of our Constitution, see *Engle* v. *Isaac,* 456 U. S. 107, 129 (1982)—applies also to Vienna Convention claims. Bustillo points to nothing in the drafting history of Article 36 or in the contemporary practice of other signatories that undermines this conclusion.

The ICJ concluded that where a defendant was not notified of his rights under Article 36, application of the procedural default rule failed to give "full effect" to the purposes of Article 36 because it prevented courts from attaching "legal significance" to the Article 36 violation. *LaGrand*, 2001 I. C. J., at 497–498, ¶¶90–91. This reasoning overlooks the importance of procedural default rules in an adversary system, which relies chiefly on the *parties* to raise significant issues and present them to the courts in the appropriate manner at the appropriate time for adjudication. See *Castro* v. *United States,* 540 U. S. 375, 386 (2003) (SCALIA, J., concurring in part and concurring in judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and

are responsible for advancing the facts and arguments entitling them to relief"). Procedural default rules are designed to encourage parties to raise their claims promptly and to vindicate "the law's important interest in the finality of judgments." *Massaro,* 538 U. S., at 504. The consequence of failing to raise a claim for adjudication at the proper time is generally forfeiture of that claim. As a result, rules such as procedural default routinely deny "legal significance"—in the *Avena* and *LaGrand* sense—to otherwise viable legal claims.

Procedural default rules generally take on greater importance in an adversary system such as ours than in the sort of magistrate-directed, inquisitorial legal system characteristic of many of the other countries that are signatories to the Vienna Convention. "What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *McNeil* v. *Wisconsin,* 501 U. S. 171, 181, n. 2 (1991). In an inquisitorial system, the failure to raise a legal error can in part be attributed to the magistrate, and thus to the state itself. In our system, however, the responsibility for failing to raise an issue generally rests with the parties themselves.

The ICJ's interpretation of Article 36 is inconsistent with the basic framework of an adversary system. Under the ICJ's reading of "full effect," Article 36 claims could trump not only procedural default rules, but any number of other rules requiring parties to present their legal claims at the appropriate time for adjudication. If the State's failure to inform the defendant of his Article 36 rights generally excuses the defendant's failure to comply with relevant procedural rules, then presumably rules such as statutes of limitations and prohibitions against filing successive habeas petitions must also yield in the

face of Article 36 claims. This sweeps too broadly, for it reads the "full effect" proviso in a way that leaves little room for Article 36's clear instruction that Article 36 rights "shall be exercised in conformity with the laws and regulations of the receiving State." Art. 36(2), 21 U. S. T., at 101.[6]

_____

[6] The dissent would read the ICJ's decisions to require that procedural default rules give way only where "the State is unwilling to provide some other effective remedy, for example (if the lawyer acts incompetently in respect to Convention rights of which the lawyer was aware) an ineffective-assistance-of-counsel claim." *Post*, at 25 (opinion of BREYER, J.). But both *LaGrand* and *Avena* indicate that the availability of a claim of ineffective assistance of counsel is *not* an adequate remedy for an Article 36 violation. See *LaGrand Case (F. R. G.* v. *U. S.)*, 2001 I. C. J. 466, 497, ¶91 (Judgment of June 27) (requiring suspension of state procedural default rule even though "United States courts could and did examine the professional competence of counsel assigned to the indigent LaGrands by reference to United States constitutional standards"); see also *Case Concerning Avena and other Mexican Nationals (Mex.* v. *U. S.)*, 2004 I. C. J. No. 128, ¶134 (Judgment of Mar. 31).

To the extent the dissent suggests that the ICJ's decisions could be read to prevent application of procedural default rules where a defendant's attorney is unaware of Article 36, see *post,* at 24–25 (opinion of BREYER, J.), this interpretation of the Convention is in sharp conflict with the role of counsel in our system. "Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman* v. *Thompson,* 501 U. S. 722, 753 (1991) (quoting *Murray* v. *Carrier,* 477 U. S. 478, 488 (1986)). Under our system, an attorney's lack of knowledge does not excuse the defendant's default, unless the attorney's overall representation falls below what is required by the Sixth Amendment. In any event, Bustillo himself does not argue that the applicability of procedural default rules hinges on whether a foreign national's attorney was aware of Article 36. See Brief for Petitioner in No. 05–51, p. 38 ("[A] lawyer may not, consistent with the purposes of Article 36, unilaterally forfeit a foreign national's opportunity to communicate with his consulate"). In fact, Bustillo has conceded that his "attorney at trial was aware of his client's rights under the Vienna Convention." App. in No. 05–51, p. 203, n. 5.

Much as Sanchez-Llamas cannot show that suppression is an appropriate remedy for Article 36 violations under domestic law principles, so too Bustillo cannot show that normally applicable procedural default rules should be suspended in light of the type of right he claims. In this regard, a comparison of Article 36 and a suspect's rights under *Miranda* disposes of Bustillo's claim. Bustillo contends that applying procedural default rules to Article 36 rights denies such rights "full effect" because the violation itself—*i.e.*, the failure to inform defendants of their right to consular notification—prevents them from becoming aware of their Article 36 rights and asserting them at trial. Of course, precisely the same thing is true of rights under *Miranda.* Police are required to advise suspects that they have a right to remain silent and a right to an attorney. See *Miranda,* 384 U. S., at 479; see also *Dickerson*, 530 U. S., at 435. If police do not give such warnings, and counsel fails to object, it is equally true that a suspect may not be "aware he even *had* such rights until well after his trial had concluded." Brief for Petitioner in No. 05–51, p. 35. Nevertheless, it is well established that where a defendant fails to raise a *Miranda* claim at trial, procedural default rules may bar him from raising the claim in a subsequent postconviction proceeding. *Wainwright* v. *Sykes,* 433 U. S. 72, 87 (1977).

Bustillo responds that an Article 36 claim more closely resembles a claim, under *Brady* v. *Maryland,* 373 U. S. 83 (1963), that the prosecution failed to disclose exculpatory evidence—a type of claim that often can be asserted for the first time only in postconviction proceedings. See *United States* v. *Dominguez Benitez,* 542 U. S. 74, 83, n. 9 (2004). The analogy is inapt. In the case of a *Brady* claim, it is impossible for the defendant to know as a *factual* matter that a violation has occurred before the exculpatory evidence is disclosed. By contrast, a defendant is well aware of the fact that he was not informed of his Article 36

rights, even if the *legal* significance of that fact eludes him.

Finally, relying on *Massaro* v. *United States,* 538 U. S. 500, Bustillo argues that Article 36 claims "are most appropriately raised post-trial or on collateral review." Brief for Petitioner in No. 05–51, p. 39. *Massaro* held that claims of ineffective assistance of counsel may be raised for the first time in a proceeding under 28 U. S. C. §2255. That decision, however, involved the question of the proper forum for *federal* habeas claims. Bustillo, by contrast, asks us to require the *States* to hear Vienna Convention claims raised for the first time in *state* postconviction proceedings. Given that the Convention itself imposes no such requirement, we do not perceive any grounds for us to revise state procedural rules in this fashion. See *Dickerson*, *supra*, at 438.

We therefore conclude, as we did in *Breard*, that claims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims.

\*   \*   \*

Although these cases involve the delicate question of the application of an international treaty, the issues in many ways turn on established principles of domestic law. Our holding in no way disparages the importance of the Vienna Convention. The relief petitioners request is, by any measure, extraordinary. Sanchez-Llamas seeks a suppression remedy for an asserted right with little if any connection to the gathering of evidence; Bustillo requests an exception to procedural rules that is accorded to almost no other right, including many of our most fundamental constitutional protections. It is no slight to the Convention to deny petitioners' claims under the same principles we would apply to an Act of Congress, or to the Constitution itself.

The judgments of the Supreme Court of Oregon and the Supreme Court of Virginia are affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

### Nos. 04–10566 and 05–51

_____

MOISES SANCHEZ-LLAMAS, PETITIONER
04–10566              *v.*
OREGON

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
OREGON

MARIO A. BUSTILLO, PETITIONER
05–51              *v.*
GENE M. JOHNSON, DIRECTOR, VIRGINIA
DEPARTMENT OF CORRECTIONS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
VIRGINIA

[June 28, 2006]

JUSTICE GINSBURG, concurring in the judgment.

I agree that Article 36 of the Vienna Convention grants rights that may be invoked by an individual in a judicial proceeding, and therefore join Part II of JUSTICE BREYER's dissenting opinion. As to the suppression and procedural default issues, I join the Court's judgment. The dissenting opinion veers away from the two cases here for review, imagining other situations unlike those at hand. In neither of the cases before us would I remand for further proceedings.

I turn first to the question whether a violation of Article 36 requires suppression of statements to police officers in Sanchez-Llamas' case and others like it. Shortly after his arrest and in advance of any police interrogation, Sanchez-Llamas received the warnings required by *Miranda* v. *Arizona,* 384 U. S. 436 (1966), in both English and Spanish. Tr. 122 (Nov. 16, 2000). He indicated that he understood

those warnings, *id.*, at 123, telling the police that he had lived in the United States for approximately 11 years, *id.*, at 124, 143, 177. After a break in questioning, Sanchez-Llamas again received *Miranda* warnings in Spanish, and again indicated that he understood them. *Id.*, at 129, 176. Sanchez-Llamas, with his life experience in the United States, scarcely resembles the uncomprehending detainee imagined by JUSTICE BREYER, *post*, at 30. Such a detainee would have little need to invoke the Vienna Convention, for *Miranda* warnings a defendant is unable to comprehend give the police no green light for interrogation. *Moran* v. *Burbine,* 475 U. S. 412, 421 (1986) (a defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent, *i.e.*, "the product of a free and deliberate choice . . . made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it"); *United States* v. *Garibay*, 143 F. 3d 534, 537–540 (CA9 1998) (defendant, who had difficulty understanding English, did not knowingly and intelligently waive his *Miranda* rights where the police recited the *Miranda* warnings only in English); *United States* v. *Short*, 790 F. 2d 464, 469 (CA6 1986) (defendant's limited comprehension of English cast substantial doubt on the validity of her *Miranda* waiver).[1]

In contrast to *Miranda* warnings, which must be given on the spot before the police interrogate, Article 36 of the Vienna Convention does not require the arresting authority to contact the consular post instantly. See *Case Concerning Avena and other Mexican Nationals (Mex.* v.

----

[1] Before trial, Sanchez-Llamas moved to suppress his statements to police on voluntariness grounds. The trial court denied the motion, finding that clear and convincing evidence established Sanchez-Llamas' knowing, voluntary, and intelligent waiver of his *Miranda* rights. Tr. 232 (Nov. 16, 2000); App. to Pet. for Cert. in No. 04–10566, pp. 10–11. Neither the Oregon Court of Appeals nor the Oregon Supreme Court addressed Sanchez-Llamas' voluntariness challenge, and this Court declined to review the question.

*U. S.)*, 2004 I. C. J. No. 128, ¶97 (Judgment of Mar. 31) *(Avena)* (United States's notification of Mexican consulate within three working days of detainee's arrest satisfied Article 36(1)(b)'s "without delay" requirement); U. S. Dept. of State, Consular Notification and Access 20, http://travel.state.gov/pdf/CNA_book.pdf (as visited June 26, 2006, and available in Clerk of Court's case file) (directing federal, state, and local law enforcement officials to notify the appropriate consular post "within 24 hours, and certainly within 72 hours" of a foreign national's request that such notification be made). Nor does that Article demand that questioning await notice to, and a response from, consular officials.[2] It is unsurprising, therefore, that the well researched dissenting opinion has not found even a single case in which any court, any place has *in fact* found suppression an appropriate remedy based on no provision of domestic law, but solely on an arresting officer's failure to comply with Article 36 of the Vienna Convention. See *post*, at 32; *ante*, at 9, n. 3.

The Court points out, and I agree, that in fitting circumstances, a defendant might successfully "raise an Article 36 claim as part of a broader challenge to the voluntariness of [a detainee's] statements to police." *Ante*, at 15. In that way, "full effect" could be given to Article 36 in a

_____

[2] See Declaration of Ambassador Maura A. Harty, Annex 4 to Counter-Memorial of the United States in *Case Concerning Avena and other Mexican Nationals (Mex.* v. *U. S.)*, 2004 I. C. J. No. 128, pp. A385–A386, ¶¶34–38 (Oct. 25, 2003) (observing that some Convention signatories do not permit consular access until after the detainee has been questioned, and that, even in countries that permit immediate consular access, access often does not occur until after interrogation); cf. *Avena*, 2004 I. C. J., ¶87 (recognizing that Article 36(1)(b)'s requirement that authorities " 'inform the person concerned without delay of his rights' cannot be interpreted to signify that the provision of such information must necessarily precede any interrogation, so that the commencement of interrogation before the information is given would be a breach of Article 36").

manner consistent with U. S. rules and regulations. But the question presented here is whether suppression is warranted simply because the State's authorities failed to comply with Article 36 of the Vienna Convention. Neither the Convention itself nor the practice of our treaty partners establishes Sanchez-Llamas' entitlement to such a remedy. See *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng,* 525 U. S. 155, 175–176 (1999) (construing the Warsaw Convention in accord with the views of the United States's treaty partners).

As to the procedural default issue, I note first two anomalies. The Court explains, and I agree, that it would be extraordinary to hold that defendants, unaware of their *Miranda* rights because the police failed to convey the required warnings, would be subject to a State's procedural default rules, but defendants not told of Article 36 rights would face no such hindrance. See *ante*, at 24. Furthermore, as the dissent apparently recognizes, in the federal court system, a later-in-time statute, codifying a federal procedural default rule, would "supersed[e] any inconsistent provision in the Convention." *Post*, at 25–26 (citing *Breard* v. *Greene,* 523 U. S. 371 (1998) *(per curiam)*). In my view, it would be unseemly, to say the least, for this Court to command state courts to relax their identical, or even less stringent procedural default rules, while federal courts operate without constraint in this regard. *Post*, at 26. That state of affairs, surely productive of friction in our federal system, should be resisted if there is a plausible choice, *i.e.*, if a reasonable interpretation of the federal statute and international accord would avoid the conflict.

Critical for me, Bustillo has conceded that his "attorney at trial was aware of his client's rights under the Vienna Convention." App. in No. 05–51, p. 203, n. 5. Given the knowledge of the Vienna Convention that Bustillo's lawyer possessed, this case fails to meet the dissent's (and the International Court of Justice's) first condition for overrid-

ing a State's ordinary procedural default rules: "[T]he [Vienna] Convention forbids American States to apply a procedural default rule to bar assertion of a Convention violation claim 'where it has been the failure of the United States [or of a State] itself to inform that may have precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial.'" *Post*, at 18 (emphasis deleted) (quoting *Avena*, 2004 I. C. J., ¶113); accord *post*, at 6, 16, 18, 23. Nothing the State did or omitted to do here "precluded counsel from . . . rais[ing] the question of a violation of the Vienna Convention in the initial trial." *Ibid.* Had counsel done so, the trial court could have made "appropriate accommodations to ensure that the defendant secure[d], to the extent possible, the benefits of consular assistance." *Ante*, at 15.[3]

In short, if there are some times when a Convention violation, standing alone, might warrant suppression, or the displacement of a State's ordinarily applicable procedural default rules, neither Sanchez-Llamas' case nor Bustillo's belongs in that category.

---------------

[3] Furthermore, once Bustillo became aware of his Vienna Convention rights, nothing prevented him from raising an ineffective-assistance-of-counsel claim predicated on his trial counsel's failure to assert the State's violation of those rights. Through such a claim, as the dissent acknowledges, see *post*, at 16, 19, 25, 29, "full effect" could have been given to Article 36, without dishonoring state procedural rules that are compatible with due process. Bustillo did not include a Vienna-Convention-based, ineffective-assistance-of-counsel claim along with his direct Vienna Convention claim in his initial habeas petition. He later sought to amend his petition to add an ineffective-assistance-of-counsel claim, but the court held that the amendment did not relate back to the initial pleading. Tr. of Oral Arg. 26, 42. The state court therefore rejected Bustillo's ineffectiveness claim as barred by the applicable state statute of limitations. App. 132. Bustillo did not seek review of that decision in this Court.

\* \* \*

For the reasons stated, I would not disturb the judgments of the Supreme Court of Oregon and the Supreme Court of Virginia.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 04–10566 and 05–51

————

## MOISES SANCHEZ-LLAMAS, PETITIONER
04–10566                          *v.*
## OREGON

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
OREGON

## MARIO A. BUSTILLO, PETITIONER
05–51                          *v.*
## GENE M. JOHNSON, DIRECTOR, VIRGINIA
## DEPARTMENT OF CORRECTIONS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
VIRGINIA

[June 28, 2006]

JUSTICE BREYER, with whom JUSTICE STEVENS and
JUSTICE SOUTER join, and with whom JUSTICE GINSBURG
joins as to Part II, dissenting.

The Vienna Convention on Consular Relations provides
that when the police of a signatory nation arrest a foreign
national, the detaining "authorities shall inform" the
foreign national "without delay" of his "righ[t]" to commu-
nicate with his nation's consular officers. Vienna Conven-
tion on Consular Relations (Vienna Convention or Conven-
tion), Arts. 36(1)(a), (b), Apr. 24, 1963, [1970] 21 U. S. T.
77, 100–101, T. I. A. S. No. 6820. We granted certiorari in
these cases to consider three related questions: (1) May a
criminal defendant raise a claim (at trial or in a postcon-
viction proceeding) that state officials violated this provi-
sion? (2) May a State apply its usual procedural default
rules to Convention claims, thereby denying the defendant
the right to raise the claim in a postconviction proceeding

on the ground that the defendant failed to raise the claim at trial? And (3) is suppression of a defendant's confession (made to police after a violation of the Convention) an appropriate remedy?

The Court assumes, but does not decide, that the answer to the first question is "yes." *Ante*, at 7–8. It answers the second question by holding that a State always may apply its ordinary procedural default rules to a defendant's claim of a Convention violation. *Ante,* at 15–25. Its answer to the third question is that suppression is never an appropriate remedy for a Convention violation. *Ante,* at 8–15.

Unlike the majority, I would decide the first question and answer it affirmatively. A criminal defendant may, at trial or in a postconviction proceeding, raise the claim that state authorities violated the Convention in his case. My answer to the second question is that *sometimes* state procedural default rules must yield to the Convention's insistence that domestic laws "enable full effect to be given to the purposes for which" Article 36's "rights . . . are intended." Art. 36(2), 21 U. S. T., at 101. And my answer to the third question is that suppression may *sometimes* provide an appropriate remedy. After answering these questions, I would remand these cases, thereby permitting the States to apply their own procedural and remedial laws, but with the understanding that the Federal Constitution requires that the application of those laws be consistent with the Convention's demand for an effective remedy for an Article 36 violation. See U. S. Const., Art. VI, cl. 2 ("[A]ll Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby").

## I

### A

The Vienna Convention is an international treaty that

governs relations between individual nations and foreign consular officials. The United States and 169 other nations have ratified the Convention. Its adoption in 1963 was perhaps "the single most important event in the entire history of the consular institution." L. Lee, Consular Law and Practice 26 (2d ed. 1991). The Convention defines consular functions to include "protecting in the receiving State the interests of the sending State and of its nationals," and "helping and assisting nationals . . . of the sending State." Arts. 5(a), (e), 21 U. S. T., at 82–83. The United States ratified the Convention in 1969.

Article 36 of the Convention governs relations between a consulate and its nationals, particularly those who have been arrested by the host country. Its object is to assure consular communication and assistance to such nationals, who may not fully understand the host country's legal regime or even speak its language. Article 36 reads as follows:

"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

"(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

"(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without de-*

*lay of his rights under this sub-paragraph*;

.            .            .            .            .

"2. The rights referred to in paragraph 1 of this Arti-
cle shall be exercised in conformity with the laws and
regulations of the receiving State, subject to the pro-
viso, however, that the said laws and regulations
must enable full effect to be given to the purposes for
which the rights accorded under this Article are in-
tended." 21 U. S. T., at 100–101 (emphasis added).

The U. S. State Department's Foreign Affairs Manual has
long stressed the importance the United States places
upon these provisions. It says, "[O]ne of the basic func-
tions of a consular office has been to provide a 'cultural
bridge' between the host community and the [U. S. na-
tional]. No one needs that cultural bridge more than the
individual U. S. citizen who has been arrested in a foreign
country or imprisoned in a foreign jail." 7 Foreign Affairs
Manual §401 (1984); see also *id.*, §§401–426 (2004).

B

In 1969, the United States also ratified (but the Presi-
dent has since withdrawn from) an Optional Protocol to
the Convention. See Optional Protocol Concerning the
Compulsory Settlement of Disputes (Optional Protocol),
Apr. 24, 1963, [1970] 21 U. S. T. 325, T. I. A. S. No. 6820;
Letter from Condoleezza Rice, Secretary of State, to Kofi
A. Annan, Secretary-General of the United Nations (Mar.
7, 2005) (giving notice of United States' withdrawal from
the Optional Protocol). The Optional Protocol provides
that "[d]isputes arising out of the interpretation or appli-
cation of the Convention shall lie within the compulsory
jurisdiction of the International Court of Justice [ICJ]." 21
U. S. T., at 326.

Acting pursuant to the Optional Protocol, Germany (in
1999) and Mexico (in 2003) brought proceedings before the
ICJ, seeking redress for what they said were violations of

Article 36 by the United States. *LaGrand Case (F. R. G.* v. *U. S.)*, 2001 I. C. J. 466 (Judgment of June 27) *(LaGrand)* (case brought by Germany); *Case Concerning Avena and other Mexican Nationals (Mex.* v. *U. S.)*, 2004 I. C. J. No. 128 (Judgment of Mar. 31) *(Avena)* (case brought by Mexico).

In Germany's case, the ICJ rejected the United States' claim that the "rights of consular notification and access under [Article 36] are rights of States, and not of individuals." *LaGrand,* 2001 I. C. J., at 19–20, ¶76. It held instead that (1) if an arrested foreign national is prejudiced by the host country's failure to inform him of his Article 36 rights, and (2) if that individual has "been subjected to prolonged detention or convicted and sentenced to severe penalties," then a diplomatic apology alone is not a sufficient remedy. *Id.,* at 32–33, ¶125. Rather, the Convention requires the host country, in that case the United States, "to allow the review and reconsideration of the" foreign national's "conviction and sentence by taking account of the violation of the rights set forth in the Convention." *Ibid.* The ICJ added that "[t]he choice of means" for providing this review "must be left to the United States." *Ibid.* In addition, the ICJ stated that in the case before it, application of a procedural default rule (that is, the rule that the LaGrands could not bring their Convention claims in habeas proceedings because they had not raised those claims at trial) violated Article 36(2) of the Convention because it "had the effect of preventing 'full effect [from being] given to the purposes for which the rights accorded under this article are intended.' " *Id.,* at 22, ¶91 (quoting Art. 36(2), 21 U. S. T., at 101). In the ICJ's view, it was "the failure of the American authorities to comply" with Article 36 that prevented the LaGrands from raising their claims earlier. *LaGrand, supra,* at 22, ¶91.

In Mexico's case, the ICJ reiterated its view that Article 36, in addition to imposing obligations on member nations,

also allows foreign nationals to bring claims based on those violations in domestic judicial proceedings. The ICJ noted that, as a matter of international law, breach of a treaty ordinarily " 'involves an obligation to make reparation in an adequate form.' " *Avena, supra,* ¶119 (quoting *Factory at Chorzów, Jurisdiction,* 1927, P. C. I. J., ser. A, No. 9, p. 21). Applying that principle to the Convention, the ICJ concluded that "the remedy to make good . . . violations [of Article 36] should consist in an obligation on the United States to permit review and reconsideration of these nationals' cases by the United States courts . . . with a view to ascertaining whether in each case the violation . . . *caused actual prejudice* to the defendant in the process of administration of criminal justice." *Avena,* 2004 I. C. J., ¶121 (emphasis added). The court added that this "review and reconsideration," to be "effective," must "fully examin[e] and tak[e] into account" any such prejudice to the defendant. *Id.,* ¶138. The ICJ declined to specify the means by which American courts should provide such "review and reconsideration." Instead, the ICJ said, the appropriate remedy depends upon an examination of "the concrete circumstances of each case" and should be determined "by the United States courts concerned in the process of their review and reconsideration." *Id.,* ¶127.

In respect to procedural default, the ICJ referenced what it said in *LaGrand,* while adding the critically important qualification that the cases in which the Convention blocked application of a procedural default rule were those in which it was "the failure of the United States itself to inform" an arrested foreign national of his right to contact the consulate that "precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial." *Avena, supra,* ¶113.

### C

For present purposes, the key sections of the Convention are (1) the provision that requires the United States to "inform" an arrested person "without delay" of his Article 36 rights, including the right to "communicat[e]" with his "consular post," and (2) the provision that says domestic laws and regulations "must enable full effect to be given" to the purposes underlying those requirements.

The key ICJ holdings are its determinations (1) that the Convention obligates a member nation to inform an arrested foreign national without delay that he may contact his consulate; (2) that the Convention requires the United States to provide some process for its courts to "review and reconside[r]" criminal convictions where there has been a prejudicial violation of this obligation; and (3) that this "review and reconsideration" cannot be foreclosed on the ground that the foreign national did not raise the violation at trial *where the authorities' failure to inform the foreign national of his rights prevented him from timely raising his claim*.

### II

The first question presented is whether a criminal defendant may raise a claim (at trial or in a postconviction proceeding) that state officials violated Article 36 of the Convention. The Court assumes that the answer to this question is "yes," but it does not decide the matter because it concludes in any event that the petitioners are not entitled to the remedies they seek. As explained below, I would resolve those remedial questions differently. Hence, I must decide, rather than assume, the answer to the first question presented.

Regardless, the first question raises an important issue of federal law that has arisen hundreds of times in the lower federal and state courts. See generally Wooster, Construction and Application of Vienna Convention on

Consular Relations (VCCR), Requiring That Foreign Con-
sulate Be Notified When One of Its Nationals Is Arrested,
175 A. L. R. Fed. 243 (2002) (collecting federal cases).
Those courts have divided as to the proper answer. Com-
pare *Cardenas* v. *Dretke*, 405 F. 3d 244 (CA5 2005) (defen-
dant cannot bring Convention claim in judicial proceed-
ing); *United States* v. *Emuegbunam*, 268 F. 3d 377 (CA6
2001) (same); *State* v. *Martinez-Rodriguez*, 2001–NMSC–
029, 33 P. 3d 267 (2001) (same); 338 Ore. 267, 108 P. 3d
573 (2005) (same); *Shackleford* v. *Commonwealth*, 262 Va.
196, 547 S. E. 2d 899 (2001) (same), with *Jogi* v. *Voges*,
425 F. 3d 367 (CA7 2005) (defendant can bring Convention
claim in judicial proceeding). And the issue often arises in
a legal context where statutes or procedural requirements
arguably block this Court's speedy review. See *Medellín* v.
*Dretke*, 544 U. S. 660 (2005) *(per curiam).* We granted the
petitions for certiorari in significant part in order to decide
this question. And, given its importance, we should do so.

   In answering the question it is common ground that the
Convention is "self-executi[ng]." See S. Exec. Rep. No. 91–
9, p. 5 (1969); see also Brief for Respondent in No. 04–
10566, pp. 9–10; Brief for Respondent in No. 05–51, p. 23.
That is to say, the Convention "operates of itself without
the aid of any legislative provision." *Foster* v. *Neilson*, 2
Pet. 253, 314 (1829). The parties also agree that we need
not decide whether the Convention creates a "private right
of action," *i.e.*, a private right that would allow an individ-
ual to bring a lawsuit for enforcement of the Convention or
for damages based on its violation. Rather, the question
here is whether the Convention provides, in these cases,
law applicable in legal proceedings that might have been
brought irrespective of the Vienna Convention claim, here
an ordinary criminal appeal and an ordinary postconvic-
tion proceeding.

   Bustillo, for example, has brought an action under a
Virginia statute that allows any convicted person to seek

release from custody on the ground that "he is detained without lawful authority." Va. Code Ann. §8.01–654(A)(1) (Lexis 2005). Sanchez-Llamas has challenged his state criminal conviction on direct appeal, and in that proceeding he is entitled to claim that his conviction violates state or federal law. In both cases the petitioners argue that a court decision favoring the prosecution would violate the Convention (as properly interpreted), and therefore the Constitution forbids any such decision. See U. S. Const., Art. VI, cl. 2. This argument in effect claims that the Convention itself provides applicable law that here would favor the petitioners if, but only if, they are correct as to their interpretation of the Convention (which is, of course, a different matter).

The petitioners must be right in respect to their claim that the Convention provides law that here courts could apply in their respective proceedings. The Convention is a treaty. And "all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby." U. S. Const., Art. VI, cl. 2. As Chief Justice Marshall long ago explained, under the Supremacy Clause a treaty is "to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision." *Foster*, *supra,* at 314.

Directly to the point, this Court stated long ago that a treaty "is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice," in such a case the court is to "resor[t] to the treaty for a rule of decision for the case before it as it would to a statute." *Head Money Cases*, 112 U. S. 580, 598–599 (1884).

As noted above, see *supra*, at 8, the parties agree that the Convention "operates of itself without the aid of any

legislative provision." *Foster*, *supra,* at 314.  The question, then, is the one this Court set forth in the *Head Money Cases:* Does the Convention set forth a "law" with the legal stature of an Act of Congress?  And as the Court explained, we are to answer that question by asking, does the Convention "prescribe a rule by which the rights of the private citizen . . . may be determined"?  Are the obligations set forth in Article 36(1)(b) "of a nature to be enforced in a court of justice"?

The "nature" of the Convention provisions raised by the petitioners indicates that they are intended to set forth standards that are judicially enforceable.  Those provisions consist of the rights of a foreign national "arrested" or "detained in any other manner" (1) to have, on his "reques[t]," the "consular post" "inform[ed]" of that arrest or detention; (2) to have forwarded "without delay" any "communication addressed to the consular post"; and (3) to be "inform[ed] . . .  without delay" of those two "rights." Art. 36(1)(b), 21 U. S. T., at 101.  These rights do not differ in their "nature" from other procedural rights that courts commonly enforce.  Cf. U. S. Const., Amdt. 6 ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation"); *ibid.* ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence"); *Miranda* v. *Arizona*, 384 U. S. 436 (1966).

Moreover, the language of Article 36 speaks directly of the "rights" of the individual foreign national.  See Art. 36(1)(b), 21 U. S. T., at 101 ("The said authorities shall inform the person concerned without delay of *his rights* under this sub-paragraph" (emphasis added)).  Article 36 thus stands in stark contrast to other provisions of the Convention, which speak in terms of the rights of the member nations or consular officials.  Cf. Art. 9, *id.,* at 86 (discussing "the *right of* any of the *Contracting Parties* to fix the designation of consular officers" (emphasis added));

Art. 34, *id.,* at 98 (consular officials shall have "freedom of movement and travel"); Art. 35, *id.,* at 99 (consular officials shall have "freedom of communication"); Art. 41(1), *id.,* at 103 ("Consular officers shall not be liable to arrest or detention pending trial").

Suppose that a pre-*Miranda* federal statute had said that arresting authorities "shall inform a detained person without delay of his right to counsel." Would courts not have automatically assumed that this statute created applicable law that a criminal defendant could invoke at trial? What more would the statute have to say? See *Medellín,* 544 U. S., at 687 (O'Connor, J., dissenting) ("And if a statute were to provide, for example, that arresting authorities 'shall inform a detained person without delay of his right to counsel,'" what "more would be required" to permit "a defendant" to "invoke that statute"?).

Further, this Court has routinely permitted individuals to enforce treaty provisions similar to Article 36 in domestic judicial proceedings. In *United States* v. *Rauscher*, 119 U. S. 407, 410–411 (1886), for example, this Court concluded that the defendant could raise as a defense in his federal criminal trial the violation of an extradition treaty that said, "'It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them . . . deliver up to justice all persons'" charged with certain crimes in the other country. Similarly, in *Kolovrat* v. *Oregon*, 366 U. S. 187, 191, n. 6 (1961), the Court held that foreign nationals could challenge a state law limiting their right to recover an inheritance based on a treaty providing that "'[i]n all that concerns the right of acquiring, possessing or disposing of every kind of property . . . citizens of [each country who reside in the other] shall enjoy the rights which the respective laws grant . . . in each of these states to the subjects of the most favored nation.'" And in *Asakura* v. *Seattle*, 265 U. S. 332, 340 (1924), the Court allowed a foreign national to challenge a city ordinance

forbidding noncitizens from working as pawnbrokers under a treaty stating that "'citizens or subjects of each of the High Contracting Parties shall have liberty . . . to carry on trade'" and "'generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects.'"

In all these cases, the Court recognized that (1) a treaty obligated the United States to treat foreign nationals in a certain manner; (2) the obligation had been breached by the Government's conduct; and (3) the foreign national could therefore seek redress for that breach in a judicial proceeding, even though the treaty did not specifically mention judicial enforcement of its guarantees or even expressly state that its provisions were intended to confer rights on the foreign national. Language and context argue yet more strongly here in favor of permitting a criminal defendant in an appropriate case to find in the Convention a law to apply in the proceeding against him.

In addition, the Government concedes that individual consular officials may enforce *other* provisions of the Convention in American courts. For example, Article 43(1) grants consular officials immunity from "the jurisdiction of the" host country's "judicial or administrative authorities" for "acts performed in the exercise of consular functions." 21 U. S. T., at 104. The federal courts have held that a consular official may raise Article 43(1) in a judicial proceeding, even though that provision does not expressly mention a judicial remedy. See, *e.g.*, *Risk* v. *Halvorsen*, 936 F. 2d 393, 397 (CA9 1991); *Gerritsen* v. *de la Madrid Hurtado*, 819 F. 2d 1511, 1515–1516 (CA9 1987); see also Brief for United States as *Amicus Curiae* 14, n. 2 (citing with approval these cases). What in Article 36 warrants treating it differently in this respect?

Finally, the international tribunal that the United States agreed would resolve disputes about the interpretation of the Convention, the ICJ, has twice ruled that an

arrested foreign national may raise a violation of the arresting authorities' obligation to "inform [him] without delay of his rights under" Article 36(1) in an American judicial proceeding. See *Avena*, 2004 I. C. J. No. 128; *LaGrand*, 2001 I. C. J. 466. That conclusion, as an "interpretation of an international agreement by an international court" deserves our "'respectful consideration.'" *Ante*, at 21. That "respectful consideration," for reasons I shall explain, see *infra*, at 18–21, counsels in favor of an interpretation that is consistent with the ICJ's reading of the Convention here.

The Government says to the contrary that Article 36 is "addressed solely to the rights of States and not private individuals"; hence, a foreign national may not claim in an American court that a State has convicted him without the consular notification that Article 36 requires. Brief for United States as *Amicus Curiae* 7. But its arguments are not persuasive. The Government rests this conclusion primarily upon its claim that there is a "long-established presumption that treaties and other international agreements do not create judicially enforceable individual rights." *Id.*, at 11.

The problem with that argument is that no such presumption exists. The Government cites three cases in support of its position, *Charlton* v. *Kelly*, 229 U. S. 447, 474 (1913); *Whitney* v. *Robertson*, 124 U. S. 190, 195 (1888); and *Foster,* 2 Pet., at 306–307. The first of these, *Charlton,* says that the question whether a treaty has been abrogated by another nation's violations is a matter with which "'judicial tribunals have nothing to do.'" 229 U. S., at 474. The second, *Whitney,* says that whether a subsequent federal statute that abrogates a treaty violates the United States' treaty obligations is a matter that has "not been confided to the judiciary." 124 U. S., at 195. The third, *Foster,* says that in "a controversy between two nations concerning national boundary, it is scarcely possi-

ble that the courts of either should refuse to abide by the measures adopted by its own government."  2 Pet., at 307. What have these issues to do with the present one?  How do these cases support the presumption that the Government claims?

Regardless, as I have just said, see *supra*, at 9, the *Head Money Cases* make clear that a treaty may confer certain enforceable "rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other." 112 U. S., at 598; see also 2 Restatement (Third) on Foreign Relations Law of the United States §907 (1986) (hereinafter Restatement) ("A private person having rights against the United States under an international agreement may assert those rights in courts in the United States").  And the language of the Convention makes clear that it is such a treaty.  Indeed, to my knowledge no other nation's courts (or perhaps no more than one) have held to the contrary.  The cases cited by the respondents and the Government do not say otherwise.  See Judgment of Nov. 7, 2001, 5 BGHSt 116 (Germany) (deciding in light of *LaGrand* that the Convention creates individual rights, but declining to suppress confession); *Queen* v. *Abbrederis* (1981) 51 F. L. R. 99, 115 (Ct. Crim. App. New South Wales (Australia)) (deciding that Convention does not "affect the carrying out of an investigation by interrogation of a foreign person coming to this country").  But see *Queen* v. *Van Bergen* [2000] 261 A. R. 387, 390 (Ct. App. Alberta (Canada)) (noting *in dictum* that the Convention "creates an obligation between states and is not one owed to the national," but affirming denial of suppression motion on the ground that "there was in any event no proven prejudice to" the defendant).  See also *Queen* v. *Partak*, [2001] 160 C. C. C. 3d 553 (Ont. Super. Ct. of J.) (applying *Van Bergen*'s "serious prejudice" test to conclude that defendant's statements were admissible); compare cases cited *infra*, at 31–32.

The Government also points out that the Executive Branch's interpretation of treaty provisions is entitled to "great weight." *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 184–185 (1982). I agree with this presumption. But the Executive's views on our treaty obligations are "not conclusive." *Ibid.*; see *Perkins* v. *Elg*, 307 U. S. 325, 328, 337–342 (1939) (declining to adopt Executive's treaty interpretation); *Johnson* v. *Browne*, 205 U. S. 309, 319–321 (1907) (same); *De Lima* v. *Bidwell*, 182 U. S. 1, 181, 194–199 (1901) (same). Where language, the nature of the right, and the ICJ's interpretation of the treaty taken separately or together so strongly point to an intent to confer enforceable rights upon an individual, I cannot find in the simple fact of the Executive Branch's contrary view sufficient reason to adopt the Government's interpretation of the Convention.

Accordingly, I would allow the petitioners to raise their claims based on violations of the Convention in their respective state-court proceedings.

## III

The more difficult issue, I believe, concerns the nature of the Convention's requirements as to remedy. In particular, Bustillo's case concerns a state procedural default rule. When, if ever, does the Convention require a state court to set aside such a rule in order to hear a criminal defendant's claim that the police did not "inform" him of his "right" to communicate with his "consular post"? Art. 36(1)(b), 21 U. S. T., at 101. The Court says that the answer is "never." See *ante*, at 15–25. In its view, the Convention does not under any circumstances trump a State's ordinary procedural rules requiring a defendant to assert his claims at trial or lose them forever.

In my view, Article 36 of the Convention requires a less absolute answer. Article 36 says that the rights it sets forth "shall be exercised in conformity with the laws and

regulations of the receiving State," but it instantly adds, "subject to the proviso . . . that the said laws and regulations must enable *full effect* to be given to the purposes for which the [Article 36] rights are . . . intended." Art. 36(2), 21 U. S. T., at 101 (emphasis added). The proviso means that a State's ordinary procedural default rules apply *unless* (1) the defendant's failure to raise a Convention matter (*e.g.*, that police failed to inform him of his Article 36 rights) can itself be traced to the failure of the police (or other governmental authorities) to inform the defendant of those Convention rights, *and* (2) state law does not provide any other effective way for the defendant to raise that issue (say, through a claim of ineffective assistance of counsel).

Several considerations lead to this conclusion. First, as I have just noted, Article 36 says both that its rights "shall be exercised in conformity with" the host country's "laws and regulations" and that those "laws and regulations must enable full effect to be given" to the purposes for which those rights "are intended." This interpretation makes *both* the "conformity" requirement and the "full effect" requirement meaningful.

Second, the Convention's drafting history supports this interpretation. The first draft of the Vienna Convention was written by the International Law Commission. Article 36(2) of that draft required only that domestic laws "not nullify" the rights afforded by the Convention. Draft Articles on Consular Relations Adopted by the International Law Commission at its Thirteenth Session, Art. 36(2), reprinted in L. Lee, Vienna Convention on Consular Relations 237 (1966). A later amendment substituted the "full effect" phrase over the strenuous objection of several negotiating countries whose delegates argued that the phrase would "modify the criminal law and regulations or the criminal procedure of the receiving state." 1 United Nations Conference on Consular Relations, Official Re-

cords, Summary records of plenary meetings and of the meetings of the First and Second Committees, U. N. Doc. A/CONF.25/16, ¶26, p. 38 (1963) (statement of Romania). See also *id.*, at ¶30, p. 38–39 (statement of Congo, Leopoldville) (amendment "implied the revision of certain laws or regulations, which it would be difficult to carry out in practice"); *id.*, 12th mtg., ¶4, at 40 (statement of Union of Soviet Socialist Republics) (rejecting the amendment because it would "force [signatories] to alter their criminal laws and regulations"); *id.*, 20th mtg., ¶81, at 84 (statement of Romania) (same); *id.*, ¶95, at 86 (statement of Czechoslovakia) (same).

Based on this objection, the Soviet Union proposed reverting to the original language. The United Kingdom opposed that measure, explaining that it supported the "full effect" version because the initial ("not nullify") version

> "meant that the laws and regulations of the receiving State would govern the rights specified . . . provided that they did not render those rights completely inoperative—for 'to nullify' meant to 'render completely inoperative.' But rights could be seriously impaired without becoming completely inoperative. . . . Consular officials should, of course, comply with the laws and regulations of the receiving State in such matters as the times for visiting prisoners, but it was most important that the substance of the rights and obligations specified . . . should be preserved." *Id.*, ¶¶6–7, at 40.

No one disagreed with the United Kingdom's understanding of the words "full effect." And with that understanding, the delegates voted down the Soviet Union's proposal to revert to the original language, and ultimately adopted the provision with the words "full effect." *Id.*, ¶109, at 87. As so enacted, the provision reflects the "essential princi-

ple of international law . . . 'that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed.' " 2 Restatement §901, at 343.

Third, the decisions of the ICJ, fairly read, interpret the Convention similarly. In *LaGrand* and *Avena*, the ICJ read the Convention as authorizing an individual foreign national to raise an Article 36 violation at trial or in a postconviction proceeding. See *Avena*, 2004 I. C. J., ¶121; *LaGrand*, 2001 I. C. J., at 32–33, ¶125. The ICJ added that the Convention requires member states to provide "effective" remedies in their courts for Convention violations. See *Avena*, *supra*, ¶138. And the ICJ made two critical statements in respect to procedural default rules. In *LaGrand*, the court said that in "itself, the [procedural default] rule does *not* violate Article 36 of the Vienna Convention." 2001 I. C. J., at 22, ¶90 (emphasis added). Rather, the "problem arises when the procedural default rule does not allow the detained individual to challenge a conviction and sentence by claiming . . . that the competent national authorities failed to comply with their obligation to provide the requisite consular information 'without delay.' " *Ibid.* And the ICJ later specified that the Convention forbids American States to apply a procedural default rule to bar assertion of a Convention violation claim "*where it has been the failure of the United States [or of a State] itself to inform that may have precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial.*" *Avena*, 2004 I. C. J., ¶113 (emphasis added).

This last statement indicates that the ICJ understood the Convention to prevent application of a procedural default rule only where the arresting authorities' failure to inform the foreign national of his Convention rights brought about the procedural default in the first place.

Taken together, the above statements make clear that the ICJ read the Convention simply to require an effective remedy. It stated repeatedly that it did not dictate what that remedy would be, as long it was offered as part of the "judicial process." *Id.,* ¶140–141. Hence, if the State provides *some other effective remedy*, for example, review for prejudice through a claim of ineffective assistance of counsel, then the Convention would not forbid application of ordinary procedural default rules. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.6 (Rev. ed. 2003) (discussing defense counsel's obligation to seek consular assistance); *Valdez* v. *Oklahoma*, 46 P. 3d 703, 710 (Okla. Crim. App. 2002) (granting postconviction relief to a defendant who had failed to raise a Vienna Convention violation at trial, because he showed that his lawyer "could have obtained financial, legal and investigative assistance from his consulate" that would have produced important new evidence); see also *Ledezma* v. *State*, 626 N. W. 2d 134, 152 (Iowa 2001) (concluding that "all criminal defense attorneys representing foreign nationals should be aware of the right to consular access as provided by Article 36, and should advise their clients of this right" because local counsel "are not equipped to provide the same services as the local consulate"); cf. *Rompilla* v. *Beard,* 545 U. S. 374 (2005).

I will assume that the ICJ's interpretation does not bind this Court in this case. Statute of the International Court of Justice, Art. 59, 59 Stat. 1062, T. S. No. 993 (1945) (ICJ decisions have "binding force" only "between the parties and in respect of that particular case"). But as the majority points out, the ICJ's decisions on this issue nonetheless warrant our "'respectful consideration.'" *Ante*, at 21. That "respectful consideration" reflects the understanding that uniformity is an important goal of treaty interpretation. See *Olympic Airways* v. *Husain*, 540 U. S. 644, 660

(2004) (SCALIA, J., dissenting) ("[I]t is reasonable to im-
pute to the parties an intent that their respective courts
strive to interpret the treaty consistently"). And the ICJ's
position as an international court specifically charged with
the duty to interpret numerous international treaties
(including the Convention) provides a natural point of
reference for national courts seeking that uniformity. See
Counter-Memorial of the United States in *Avena,* 2004
I. C. J. No. 128, p. 61, n. 128 (Nov. 3, 2003) (even if ICJ
decision binds only in particular case, "it is well-settled"
that an ICJ decision "may serve as authority beyond a
particular case"; citing authorities); Ordonez & Reilly,
Effect of the Jurisprudence of the International Court of
Justice on National Courts, in International Law Deci-
sions in National Courts 335, 365 (T. Franck & G. Fox eds.
1996) (noting that ICJ cases interpreting treaties "are
routinely cited by domestic judges" in many countries "as
evidence of international law").

That "respectful consideration" also reflects an under-
standing of the ICJ's expertise in matters of treaty inter-
pretation, a branch of international law. The ICJ's opin-
ions "are persuasive evidence" of what "[international] law
is." 1 Restatement §103, comment *b,* at 37; see also Mor-
rison, Treaties as a Source of Jurisdiction, Especially in
U. S. Practice, in The International Court of Justice at a
Crossroads 58, 61 (L. Damrosch ed. 1987); *The Paquete
Habana,* 175 U. S. 677, 700 (1900) ("[T]rustworthy evi-
dence of what [international] law really is" can be found in
"the works of jurists and commentators, who by years of
labor, research and experience have made themselves
peculiarly well acquainted with the subjects of which they
treat"); L. Henkin, R. Pugh, O. Schachter, & H. Smit,
International Law: Cases and Materials 120 (3d ed. 1993)
("[T]he decisions of the International Court of Justice are,
on the whole, regarded by international lawyers as highly
persuasive authority of existing international law").

Thus, this Court has repeatedly looked to the ICJ for guidance in interpreting treaties and in other matters of international law. See, *e.g.*, *United States* v. *Maine*, 475 U. S. 89, 99–100 (1986) (referring to the *Fisheries Case (United Kingdom* v. *Norway),* 1951 I. C. J. 116, as legal authority in a maritime boundary dispute); *United States* v. *Louisiana*, 470 U. S. 93, 107 (1985) (same); *United States* v. *Louisiana*, 394 U. S. 11, 69–72 (1969) (same); *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 628, and n. 20 (1983) (citing *Case Concerning The Barcelona Traction, Light & Power Co.*, 1970 I. C. J. 3, for the proposition that an incorporated entity "is not to be regarded as legally separate from its owners in all circumstances"); *United States* v. *California*, 381 U. S. 139, 172 (1965) (citing the *Corfu Channel Case*, 1949 I. C. J. Rep. 4, in boundary dispute); *Reid* v. *Covert*, 354 U. S. 1, 61 (1957) (plurality opinion) (citing *France* v. *United States*, 1952 I. C. J. Rep. 176, as authority for the meaning of the word "'disputes'" in international treaties).

The lower courts have done the same. See, *e.g.*, *McKesson Corp.* v. *Islamic Republic of Iran*, 52 F. 3d 346, 352 (CADC 1995); *Princz* v. *Federal Rupublic of Germany*, 26 F. 3d 1166, 1180, 1184 (CADC 1994) (Wald, J., dissenting); *Siderman de Blake* v. *Republic of Argentina*, 965 F. 2d 699, 715 (CA9 1992); *Committee of United States Citizens Living in Nicaragua* v. *Reagan*, 859 F. 2d 929, 932, 935 (CADC 1988); *Arcoren* v. *Peters*, 811 F. 2d 392, 397, n. 11 (CA8 1987); *Conservation Law Foundation of New England* v. *Secretary of Interior*, 790 F. 2d 965, 967 (CA1 1986); *Persinger* v. *Islamic Republic of Iran*, 729 F. 2d 835, 837, 843 (CADC 1984); *McKeel* v. *Islamic Republic of Iran*, 722 F. 2d 582, 585 (CA9 1983); *Cruz* v. *Zapata Ocean Resources, Inc.,* 695 F. 2d 428, 433, and nn. 8–9 (CA9 1982); *Spiess* v. *C. Itoh & Co. (America),* 643 F. 2d 353, 365 (CA5 1981) (Reavley, J., dissenting); *Agee* v. *Muskie*, 629 F. 2d 80, 90 (CADC 1980) (MacKinnon, J., dissenting);

*Sadat* v. *Mertes*, 615 F. 2d 1176, 1188, n. 14 (CA7 1980); *Narenji* v. *Civiletti*, 617 F. 2d 745, 748 (CADC 1979); *United States* v. *Postal*, 589 F. 2d 862, 869 (CA5 1979); *McComish* v. *Commissioner*, 580 F. 2d 1323, 1329 (CA9 1978); *Diggs* v. *Richardson*, 555 F. 2d 848, 849 (CADC 1976); *Island Airlines, Inc.* v. *CAB*, 352 F. 2d 735, 741 (CA9 1965); *Rogers* v. *Societe Internationale Pour Participations Industrielles et Commerciales, S. A.*, 278 F. 2d 268, 273, n. 3 (CADC 1960) (Fahy, J., dissenting); *Greenpeace, Inc.* v. *France*, 946 F. Supp. 773, 783 (CD Cal. 1996); *Looper* v. *Morgan*, Civ. No. H–92–0294, 1995 WL 499816, *1 (SD Tex., June 23, 1995); *Koru North America* v. *United States*, 701 F. Supp. 229, 232 (CIT 1988); *United States* v. *Central Corp. of Ill.,* No. 87 C 5072, 1987 WL 20129 (ND Ill. Nov. 13, 1987); *United States* v. *Palestine Liberation Organization,* 695 F. Supp. 1456, 1461–1462, 1467 (SDNY 1988); *Morgan Guaranty Trust Company of N. Y.* v. *Republic of Palau*, 639 F. Supp. 706, 715 (SDNY 1986); *Massachusetts* v. *Clark*, 594 F. Supp. 1373, 1387–1388, n. 8 (Mass. 1984); *United States-South West Africa / Namibia Trade & Cultural Council* v. *Department of State*, 90 F. R. D. 695, 696, n. 2 (DC 1981); *Zenith Radio Corp.* v. *Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1187 (ED Pa. 1980); *Rodriguez Fernandez* v. *Wilkinson*, 505 F. Supp. 787, 797 (Kan. 1980); *In re Alien Children Ed. Litigation,* 501 F. Supp. 544, 591 (SD Tex. 1980); *American Int'l Group, Inc.* v. *Islamic Republic of Iran*, 493 F. Supp. 522, 525 (DC 1980); *National Airmotive* v. *Government and State of Iran*, 491 F. Supp. 555, 556 (DC 1980); *CAB* v. *Island Airlines, Inc.*, 235 F. Supp. 990, 1003–1004, and nn. 23–24, 1005, and n. 27 (Haw. 1964); *United States* v. *Melekh*, 190 F. Supp. 67, 81, 89 (SDNY 1960); *Balfour, Guthrie & Co.* v. *United States*, 90 F. Supp. 831, 834, n. 1 (ND Cal. 1950).

Today's decision interprets an international treaty in a manner that conflicts not only with the treaty's language

and history, but also with the ICJ's interpretation of the same treaty provision. In creating this last-mentioned conflict, as far as I can tell, the Court's decision is unprecedented.

The Court supports its interpretation in three basic ways. First, the majority says that "respectful consideration" does not require us to agree with a decision that is clearly wrong. And, it says, the ICJ's decision is clearly wrong. The ICJ's interpretation of Article 36, the majority says, would permit a Convention violation claim to "trump not only procedural default rules, but any number of other rules requiring parties to present their legal claims at the appropriate time for adjudication." *Ante,* at 22. That interpretation, it adds, "overlooks the importance of procedural default rules in an adversary system," and is "inconsistent with the basic framework" of that "system." *Ante,* at 21–22.

The majority's argument, however, overlooks what the ICJ actually said, overstates what it actually meant, and is inconsistent with what it actually did. In *Avena* and *LaGrand,* the ICJ did not say that the Convention necessarily trumps any, let alone all, procedural rules that would otherwise bar assertion of a Convention violation claim. Nor did it say that the Convention necessarily trumps all procedural default rules. Rather, it said that the Convention prohibits application of those rules to a Convention violation claim only "where it has been the *failure* of the United States [or of a State] itself *to inform* that may have precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial." *Avena,* 2004 I. C. J., ¶113 (emphasis added). Thus, Article 36(2) precludes procedural default only *where the defendant's failure to bring his claim sooner is the result of the underlying violation.* Since procedural default rules themselves typically excuse defaults where a defendant shows "cause and prejudice," it

is difficult to see how this statement "overlooks the importance of procedural default rules in an adversary system," or is "inconsistent with the basic framework" of that "system."

Moreover, *Avena* and *LaGrand* make clear what the ICJ's language taken in context means: The Convention requires effective national remedies; hence local procedural rules must give way (to the Convention's "full effect" requirement) when, but only when, it is the failure of the arresting authorities to inform the defendant of his Convention rights that prevented the defendant from bringing his claim sooner. The opinions nowhere suggest that a State must provide a procedural remedy to a defendant who, for example, sleeps on his rights.

Consider, too, what the ICJ did in *Avena,* a case that clarified the court's earlier *LaGrand* opinion. It did not hold that American courts must ignore their procedural default rules in each of the 54 individual cases at issue. Rather, it held that domestic courts must provide "review and reconsideration" in each case. *Avena,* 2004 I. C. J., ¶153(9). It nowhere forbids a state court conducting such a "review" to bar claims not timely made provided that the violation did not itself cause the delay. See *id.*, ¶139.

Perhaps the ICJ's opinions are open to different interpretations. But how does reading those opinions as creating an extreme rule of law, as reflecting a lack of understanding of the "adversary system," show "respectful consideration"? To show that kind of respect, we must read the opinions in light of the Convention's underlying language and purposes and ask whether, or to what extent, they require modification of a State's ordinary procedural rules. See Art. 36(2), 21 U. S. T., at 101 (laws and regulations "must enable full effect to be given *to the purposes* for which the rights accorded under this Article are intended" (emphasis added)).

Nothing in *Avena* suggests, for example, that an ar-

rested foreign national who was already aware of his rights under Article 36, or who had a lawyer who was aware of those rights, necessarily would be entitled to an exemption from the State's procedural default rules under Article 36(2). Instead, as I have explained, see *supra*, at 18–19, 23, *Avena* says only that Article 36(2) requires a state court to excuse a procedural default rule where the State failed to inform the defendant of his consular access rights, *and* the defendant was not aware of those rights, *and* the State is unwilling to provide some other effective remedy, for example (if the lawyer acts incompetently in respect to Convention rights of which the lawyer was aware) an ineffective-assistance-of-counsel claim. The Court's reluctance to give *LaGrand* and *Avena* this perfectly reasonable interpretation reflects a failure to provide in practice the "respectful consideration" that we all believe the law demands.

The Court also relies on *Breard* v. *Greene,* 523 U. S. 371 (1998) *(per curiam)*. In that case a foreign national, claiming a Convention violation, sought federal habeas corpus. This Court upheld a denial of relief on the ground that the lower courts had correctly found that Breard procedurally defaulted his Convention violation claim by failing to timely raise it in his state-court proceedings. In reaching its conclusion, the Court rejected Breard's claim that the Convention trumped the procedural default rule. Its reasons were (1) that "it has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State," *id.*, at 375; (2) that this principle is "embodied in the Vienna Convention itself, which provides that the rights expressed in the Convention 'shall be exercised in conformity with the laws and regulations of the receiving State,'" *ibid.;* and (3) that the federal procedural default rule, as a later-in-time federal statute, superseded any inconsistent

provision in the Convention, *id.*, at 376.

I do not believe that *Breard* controls the outcome of these cases. With respect to the third ground for the Court's decision, *Breard* concerned a *federal*, rather than (as in Bustillo's case) a *state*, procedural default rule. Those different kinds of rules are treated differently under the Supremacy Clause. See *ibid.* (applying the rule that "'an Act of Congress . . . is on a full parity with a treaty, and . . . when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null'"). Contrary to JUSTICE GINSBURG's view, then, *ante*, at 4, there is no anomaly in treating state law differently from federal law for these purposes, if Congress chooses to enact legislation binding only the federal government in respect to a matter covered by a treaty that binds both the federal government and the States. Therefore, reading the Convention to require the state courts to set aside Virginia's procedural default rule in Bustillo's case (assuming for argument's sake that his case meets the criteria I have described, see *supra*, at 15–16) would not call into question, let alone overrule, "*Breard*'s plain holding that the Convention does not trump the *[federal]* procedural default doctrine," *ante*, at 18, n. 4 (opinion of the Court), even if that ruling on its own terms is still good law after *Avena* and *LaGrand*.

Moreover, the ICJ decided *Avena* and *LaGrand* after this Court decided *Breard.* And it is not difficult to reconcile those cases with *Breard* because they do not directly conflict with *Breard*'s result. Rather, they interpret Article 36(2) to require state procedural default rules *sometimes* to give way to the Convention, namely, when those rules prevent effective remedy by barring assertion of a claim because of a delay caused by the Convention violation itself. I would read *Breard* as consistent with this interpretation, *i.e.*, as not saying that the Convention *never* trumps any procedural default rule.

The Court complains that this treatment of *Breard* fails to give our own opinions "'respectful consideration.'" *Ante*, at 18, n. 4. In fact, our opinions are entitled to far more than respectful consideration; they are entitled to full *stare decisis* effect. But, as I have explained, reading *Breard* not to decide the outcome in this case would neither overrule *Breard*'s holding, nor reject outright its reading of the Convention. And, in any event, as a matter of the law of *stare decisis*, a modified reading of *Breard* is appropriate in light of the fact that the ICJ's later decisions amount to a "significant . . . subsequent development" of the law sufficient to lead to a reconsideration of past precedent. *Agostini* v. *Felton,* 521 U. S. 203, 236 (1997); *United States* v. *Percheman,* 7 Pet. 51 (1833) (revisiting prior treaty interpretation when new international law has come to light); see also *Medellín,* 544 U. S., at 689 (O'Connor, J., dissenting) ("In the past the Court has revisited its interpretation of a treaty when new international law has come to light" (citing *Percheman, supra,* at 89)). Indeed, the Court seems to recognize as much, in that it spends a full six pages explaining why the ICJ's interpretation of the Convention is incorrect, see *ante*, at 18–24, rather than simply rejecting Bustillo's argument on the ground that "'respectful consideration' of precedent should begin at home." *Ante,* at 18, n. 4.

And there are other reasons not to place too much reliance on the breadth of *Breard*'s language. *Breard* is a *per curiam* decision that the Court had to reach within the few hours available between the time a petition for certiorari was filed and a scheduled execution, the decision is fairly recent, and the modification to which I refer requires no more than reading an exception into *Breard*'s language, language that in any event was not central to the Court's holding.

The modification is appropriate too because the "full effect" proviso in Article 36(2) provides a "clear and ex-

press statement" that sometimes the Convention might trump a domestic procedural rule. And in any event, it is not even clear that such a clear statement rule actually exists. *Breard's* statement of a presumption that only a treaty provision with a "clear and express statement" can trump "the procedural rules of the forum State," 523 U. S., at 375, is in tension with more fundamental interpretive rules in this area. See, *e.g., Jordan* v. *Tashiro,* 278 U. S. 123, 127 (1928) (treaties must be construed liberally to protect substantial rights); *Asakura,* 265 U. S., at 342 (same); see also Vienna Convention on the Law of Treaties, opened for signature May 23, 1969, Art. 27, 1115 U. N. T. S. 331, T. S. No. 58 (1980), 8 I. L. M. 679 (1969) (treaty parties may not invoke domestic law as an excuse for failing to conform to their treaty obligations).

Indeed, the cases *Breard* cites for the proposition that a clear and express statement is required to trump a domestic procedural rule seem not to establish it. *Sun Oil Co.* v. *Wortman,* 486 U. S. 717, 723 (1988) (Court said only that it was a "rule in international law at the time the Constitution was adopted" that procedural rules "may be governed by forum law even when the substance of the claim must be governed by another State's law"; case involved domestic law and the Constitution's Full Faith and Credit Clause); *Le Roy* v. *Crowninshield,* 15 F. Cas. 362, 365, 371 (Mass. 1820) (case involved conflict of laws, not an international treaty); *Volkswagenwerk Aktiengesellschaft* v. *Schlunk,* 486 U. S. 694, 700 (1988) (case said that "we almost necessarily must refer to the internal law of the forum state" to find a service of process standard if a treaty "does not prescribe" it); *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa,* 482 U. S. 522, 539–540, and n. 25 (1987) (case involving a specific treaty, not a general interpretive standard).

Finally, the Court says it would be odd to treat Conven-

tion rights more favorably than rights protected by the
U. S. Constitution. *Ante*, at 24. But "[a] treaty is in its
nature a contract between two nations," *Foster,* 2 Pet., at
314, and nations are of course free to agree to grant one
another's citizens protections that differ from the protec-
tions enjoyed by citizens at home, particularly when cir-
cumstances call for differential treatment. See *infra*, at
30.

In sum, I find strong reasons for interpreting the Con-
vention as sometimes prohibiting a state court from apply-
ing its ordinarily procedural default rule to a Convention
violation claim. The fact that the ICJ reached a similar
conclusion in *LaGrand* and *Avena* adds strength to those
reasons. And I cannot agree with the majority's argu-
ments to the contrary.

Consequently, I would remand No. 05–51 so that Busti-
llo can argue to the Virginia state courts that they should
modify their ordinary procedural default requirements. I
would leave it to the state courts to determine in the first
instance whether state law has provided Bustillo the
effective remedy that the Convention requires and how it
has done so (whether through "cause and prejudice" excep-
tions, ineffective-assistance-of-counsel claims, or other
ways). Cf. *LaGrand*, 2001 I. C. J., at 33, ¶125 (the "choice
of [implementing] means must be left to the United
States").

## IV

The final question presented asks whether a Convention
violation "result[s] in the suppression" of the evidence, say
a confession, that a foreign national provided police before
being informed of his Convention rights. Pet. for Cert. in
No. 04–10566, p. i. The majority answers in absolute
terms, stating that "suppression is not an appropriate
remedy for a violation of the Convention." See *ante*, at 2.
I agree with the majority insofar as it rejects the argu-

ment that the Convention creates a *Miranda*-style "auto-matic exclusionary rule."  *Ante*, at 8; see also *Miranda,* 384 U. S., at 471; cf., *e.g.*, *Mapp* v. *Ohio,* 367 U. S. 643 (1961); *Franks* v. *Delaware,* 438 U. S. 154 (1978).  But I do not agree with the absolute nature of its statement. Rather, *sometimes* suppression could prove the only effec-tive remedy.  And, if that is so, then the Convention, which insists upon effective remedies, would require sup-pression in an appropriate case.  Art. 36(2), 21 U. S. T., at 101.

Much depends upon the circumstances.  It may be true that in "most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police."  *Ante*, at 14.  *Miranda* surely helps, for it guarantees that police will inform an arrested foreign national of his right to contact a lawyer. But one cannot guarantee in advance that *Miranda* will adequately cure *every* seriously prejudicial failure to in-form an arrested person of his right to contact his consular post. One can imagine a case, for example, involving a foreign national who speaks little English, who comes from a country where confessions made to the police cannot be used in court as evidence, who does not understand that a state-provided lawyer can provide him crucial assistance in an interrogation, and whose native community has great fear of police abuse.  Indeed, Sanchez-Llamas made allega-tions similar to these in his case.  Brief for Petitioner San-chez-Llamas 5-7; see also Brief for the Government of the United Mexican States as *Amicus Curiae* 10.

While JUSTICE GINSBURG is correct that a defendant who is prejudiced under the Convention may be able to show that his confession is involuntary under *Miranda*, *ante*, at 2, I am not persuaded that this will always be so. A person who fully understands his *Miranda* rights but does not fully understand the implications of these rights for our legal system may or may not be able to show that

his confession was involuntary under *Miranda*, but he will certainly have a claim under the Vienna Convention. In such a case suppression of a confession may prove the only effective remedy. I would not rule out the existence of such cases in advance.

Furthermore, the majority is wrong to say that it would "be startling if the Convention were read to require suppression" in such cases because suppression "is an entirely American legal creation." *Ante*, at 8 (opinion of the Court). I put to the side the fact that "suppression" is in origin a British, not an American, remedy. See *Dickerson* v. *United States,* 530 U. S. 428, 433 (2000) (noting that "the roots of the *[Miranda]* test developed in the common law" and citing English cases); see also *King* v. *Warickshall*, 1 Leach 262, 263–264, 168 Eng. Rep. 234, 235 (K. B. 1783) (coerced confessions are inadmissible in British courts). Regardless, it is not "startling" to read the Convention as *sometimes* requiring suppression. That is because those who wrote the Convention were fully aware that the criminal justice systems of different nations differ in important ways. They did not list particular remedies. They used general language. That language requires every member nation to give "full effect" to Article 36(1)'s "purposes." Art. 36(2), 21 U. S. T., at 101. That language leaves it up to each nation to determine how to implement Article 36(1)'s requirements. *Avena*, 2004 I. C. J., ¶127; *LaGrand*, *supra,* at 32–33, ¶125. But as a matter of logic and purpose that language must also insist upon the use of suppression if and when there are circumstances in which suppression provides the only *effective remedy*.

These differences may also help to explain what the majority says is the disturbing circumstance that "nearly all" other signatories to the Convention "refuse to recognize" suppression "as a matter of domestic law," and therefore that "Sanchez-Llamas would [not] be afforded the relief he seeks here in any of the other 169 countries party

to the Vienna Convention." *Ante*, at 9.  In fact, there are several cases from common-law jurisdictions suggesting that suppression is an appropriate remedy for a Convention violation.  See, *e.g.*, *Tan Seng Kiah* v. *Queen* (2001) 160 F. L. R. 26 (Ct. Crim. App. N. Terr.) (Australian case suppressing confession obtained in violation of statute requiring police to notify defendant of right to contact consulate upon arrest); *Queen* v. *Tan* [2001] W. A. S. C. 275 (Sup. Ct. W. Australia in Crim.) (Australian case considering but declining to suppress evidence based on violation of same statute); *Regina* v. *Partak,* 160 C. C. C. 3d, at ¶63 (Canada) (concluding that suppression is inappropriate, not because it was never a proper remedy under the Vienna Convention but because the defendant "completely failed to demonstrate any prejudice arising from the failure of the police to notify him of his consular rights").

I concede the absence of such cases from civil law jurisdictions.  But the criminal justice systems in those nations differ from our own in significant ways.  Civil-law nations, for example, typically rely more heavily than do we upon judicial investigation, questioning by a neutral magistrate, the compiling of all evidence into a dossier, and later review of that dossier at trial by judges who may sit without our type of jury.  In such a system, formal suppression proceedings may prove less frequent.  Judges, as a matter of practice, may simply disregard improperly obtained evidence, they may discount the significance of that evidence, or they may adjust the nature of future proceedings or even the final sentence accordingly.  See Damaška, Evidentiary Barriers to Conviction and Two Models of Criminal Procedure: A Comparative Study, 121 U. Pa. L. Rev. 506, 522 (1972) (explaining why many civil law system "provisions regulating the interrogation of defendants are silent as to the admissibility of testimony obtained in violation of proper interrogation procedures");

see also Van Kessel, European Perspectives on the Accused as a Source of Testimonial Evidence, 100 W. Va. L. Rev. 799, 831 (1997) ("Because [civil law] courts decide both questions of law and of fact, exclusionary rules in [those] courts are more appropriately described as rules of decision than rules of exclusion—what evidence the factfinder may use to support its decision, rather than what evidence may be presented to the factfinder. The presiding judge is well acquainted with all evidence in the dossier and often must 'put aside' or 'forget about' evidence which legally cannot be used to support the judgment"); Bradley, The Exclusionary Rule in Germany, 96 Harv. L. Rev. 1032, 1065 (1982) (noting that in German inquisitorial system, for many police violations, "the fact that evidence was legally or illegally obtained is not dispositive"; instead, the "decision to admit or suppress will be determined by balancing the relative importance of the defendant's privacy rights against the seriousness of the offense charged"); Declaration of Professor Thomas Weigend, Annex 3 to Counter-Memorial of the United States, in *Avena,* 2004 I. C. J. No. 128, p. A367, ¶20 (Oct. 22, 2003) (noting that in the German and Dutch legal systems, a procedural violation can lead to a reduced sentence).

Thus, the *absence* of reported decisions formally suppressing confessions obtained in violation of the Convention tells us nothing at all about whether such nations give "full effect" to the "purposes" of Article 36(1). The existence of cases in such nations where a court denies a defense request to suppress, of course, might well shed light on that nation's readiness to provide an effective remedy. The Solicitor General cites one (and only one) such case. See Judgment of Nov. 7, 2001, 5 BGHSt 116 (deciding in light of *LaGrand* that the Convention creates individual rights, but declining to suppress confession). That is the only support I have found for the claim that

somehow the petitioners here are asking the United States to provide that which other countries deny, an effective remedy.

V

The United States joined the Vienna Convention, and urged other nations to join, in order to promote "the orderly and effective conduct of consular relations between States," and to guarantee "the protection of our citizens abroad." Vienna Convention on Consular Relations with Optional Protocol, S. Exec. Doc. No. E, 91st Cong., 1st Sess., 60, 75 (1969). In doing so, the United States, along with the other 169 nations that ratified the Convention, undertook a complex task. They sought not only to protect their consular posts, but also to assure that their nationals would have access to those posts when arrested abroad. But how to enforce those rights poses a difficult question because the enforcement mechanism inevitably will vary depending upon the details of a nation's legal system. For practical, legal, and political, reasons, it is difficult to write enforcement details into an international treaty. Yet without any such guarantees it may prove difficult to prevent an individual nation, through application of its system's details, from denying in practice the rights that the treaty sought to assure.

The Convention deals with this problem by including a general provision that *both* severely limits the treaty's intrusion into the functioning of a domestic legal system *and also* safeguards consular access rights from serious domestic neglect. It does so by stating that those rights shall "be exercised in conformity with the laws and regulations of the receiving State," *provided that* those laws and regulations give "full effect" to Article 36(1)'s purposes. Art. 36(2), 21 U. S. T., at 101.

Applying this provision to our own legal system, I would seek to minimize the Convention's intrusion and federal

intrusion into the workings of state legal systems while simultaneously keeping faith with the Convention's basic objectives. That is why I believe that the Convention here requires individual States to make an exception (akin to a "cause and prejudice" exception) to a state procedural default rule if (1) the defendant's failure to raise a claim of a Convention violation in a timely manner itself was a product of that violation, and (2) state law provides no other procedural means through which the State's courts can provide "review," "reconsideration," and effective relief. Similarly, I would hold that whether the Convention requires a state court to suppress a confession obtained after an Article 36 violation depends on whether suppression is the only remedy available that will effectively cure related prejudice. And because neither state court applied this standard below, I would remand each case for that initial consideration. See 338 Ore., at 269, 108 P. 3d, at 574 (rejecting Sanchez-Llamas' request for suppression remedy solely on the ground that the Convention "does not create rights that individual foreign nationals may assert in a criminal proceeding"); App. to Pet. for Cert. 47a (rejecting Bustillo's request for state postconviction relief based on a standard different from that set forth here).

The interpretation of the Convention that I would adopt is consistent with the ICJ's own interpretation and should not impose significant new burdens upon state criminal justice systems. America's legal traditions have long included detailed rules for discovering and curing prejudicial legal errors. Indeed, many States already have "cause and prejudice" exceptions likely broad enough to provide the "effective" relief the Convention demands. And, in any event, it leaves the States free to apply their own judicial remedies in light of, and bounded by, the Convention's general instructions.

The Court, I fear, does not rise to the interpretive chal-

lenge. Rather than seek to apply Article 36's language and purposes to the federal/state relationships that characterize America's legal system, it simply rejects the notion that Article 36(2) sets forth any relevant requirement. That approach leaves States free to deny effective relief for Convention violations, despite America's promise to provide just such relief. That approach risks weakening respect abroad for the rights of foreign nationals, a respect that America, in 1969, sought to make effective throughout the world. And it increases the difficulties faced by the United States and other nations who would, through binding treaties, strengthen the role that law can play in assuring all citizens, including American citizens, fair treatment throughout the world.

Accordingly, I respectfully dissent.